**Julius Long STERN and Ellen V. Stern, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

**No. 11226.**

United States Court of Appeals Third Circuit.

Argued May 4, 1954.

Decided Sept. 17, 1954.

---

6. 26 U.S.C.A. § 161(a) (3).

7. See Code of Federal Regulations, Cumulative Supplement, 1938–43, Title 26, Section 29.162–1, pp. 6358–6359.

Edgar J. Goodrich, Washington, D. C. (Lipman Redman, Guggenheimer, Untermyer, Goodrich & Amram, Washington, D. C., on the brief), for petitioners.

Meyer Rothwacks, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to the Atty. Gen., on the brief), for respondent.

Before MARIS, KALODNER and HASTIE, Circuit Judges.

MARIS, Circuit Judge.

This petition to review a decision of the Tax Court presents the question whether the loss, if any, which the taxpayer sustained upon the sale of his former residence in 1948 was non-deductible for income tax purposes under section 24(b) (1) (A) of the Internal Revenue Code, 26 U.S.C.A. § 24(b) (1) (A). The facts in the case as found by the Tax Court are these:

The taxpayer,[1] Julius Long Stern, built a residence for himself at 36 West River Street, Wilkes-Barre, Pennsylvania, in 1925, at an approximate cost of $110,000. It is one of the four or five outstanding residences of Wilkes-Barre and is located in the most desirable residential section of the city. The taxpayer occupied the West River Street property as his personal residence until May 1947 when he moved to his new home in West Dallas, Pennsylvania. Construction on the taxpayer's new house had started in March 1946. At that time he decided to sell the West River Street property and discussed the matter first in the summer of 1946 with John Howell, and then in September 1946 with Harry Goeringer, both of whom are qualified real estate experts in Wilkes-Barre and who were

---

1. Taxpayer and his wife, who is not involved in this matter, filed a joint return and hence are joined as petitioners.

intimately acquainted with the house at that time. The house was listed for sale first with the office of John Howell and later with Harry Goeringer at a price of $75,000. Later in January 1947, the house was also listed with other real estate offices in Wilkes-Barre. In September 1946 Harry Goeringer appraised the property at a fair market value of $60,-000. Intensive efforts to sell the house were carried on by the real estate offices referred to above and the house was advertised for sale and other steps taken to interest prospective purchasers. Several prospects had been shown through the property and in March 1947 Charles S. Popky, through his attorney, submitted an offer to buy the house, including most of the furnishings, for a price of $40,000. The offer was accompanied by a check for $1,000. The furnishings of the West River Street property had been independently appraised by a qualified expert at a fair market value of $10,000. The Popky offer, which was based solely on Popky's ability to pay, was immediately rejected by the taxpayer as being far too low.

The taxpayer had been on the board of directors of the Miners National Bank of Wilkes-Barre for 25 years. In April 1947 he applied to the Miners National Bank for a loan on the West River Street property. As a result of the application Guy W. Moore and Harry Goeringer, both of whom were directors of, and appraisers for, the Miners National Bank, appraised the house for mortgage loan purposes at $50,000 and recommended a loan of 50% thereof to the taxpayer. The loan was granted in the amount of $25,000 and a mortgage for that amount was taken by the Miners National Bank on the property.

On June 5, 1947, Harry Goeringer made a third appraisal of the West River Street property for fair market value sales purposes and fixed the value at $60,000. The years 1946 and 1947 were years of a very active real estate market in Wilkes-Barre, during which years materials for building purposes were scarce.

In the Spring of 1947, the taxpayer's son-in-law, Dr. Samuel A. Guttman, informed the taxpayer that he had decided to move to Wilkes-Barre and open an office for the practice of psychiatry. This decision of Dr. Guttman was based upon his own judgment, after consultation with his wife but without the advice or suggestion of the taxpayer. Dr. Guttman was motivated by his desire to practice in a smaller community in which he could combine both his home and his office and in which living conditions would be less difficult than in Philadelphia, where he had been practicing. In addition, he was familiar with the area and knew that there was no other practicing psychiatrist in Wilkes-Barre or in Luzerne or Lackawanna counties.

Dr. Guttman inquired whether the taxpayer would rent the West River Street property. The house was expensive for the taxpayer to maintain and, after consultation with Harry Goeringer, the taxpayer decided to rent the house in order to cut down the cost of maintaining two houses. Upon the advice of Goeringer, a rental of $200 a month was set and the taxpayer leased the property at that rental for the period of one year beginning September 1, 1947. This rental was the highest rental for comparable property in Goeringer's experience and was paid from Dr. Guttman's professional earnings. The rental was paid by check and reported by the taxpayer on his income tax return.

Dr. Guttman, who anticipated a rental for longer than one year, made improvements in the West River Street property at a cost of approximately $3,000 in order to make it more readily usable as a combined home and office. The funds for these improvements were derived from Dr. Guttman's professional earnings, which were approximately $20,000 per year for the period 1946 through 1949.

By the summer of 1948, the Popky offer was the only offer received by the taxpayer on the West River Street property and at that time he had a further discussion respecting the property with Goeringer. He was informed that the real estate market in Wilkes-Barre had suffered a substantial decline from the beginning of 1948, caused by the fact

that building materials had become more plentiful, that there was a new suburban trend and a new trend toward the ranch-type house, which had resulted in reducing the fair market value of the taxpayer's West River Street property. The taxpayer was further advised by Goeringer that unless he was willing to wait for an indefinite period he would have to take a substantial loss in order to effect a reasonably prompt sale.

Thereupon the taxpayer decided to sell the house at the best price he could get, regardless of the property's fair market value. He was motivated in reaching this decision by the fact that the West River Street property in addition to his own residence was expensive to maintain and by the fact that the West River Street property was encumbered by a mortgage, which was undesirable to the taxpayer. When in the late summer of 1948 Dr. Guttman asked the taxpayer to renew his lease, he was informed that the house was for sale at the best possible price and that the taxpayer was asking $30,000 for the property without the furnishings. Dr. Guttman decided to, and did, purchase the house from the taxpayer at a price of $30,000. From his professional earnings he gave the taxpayer a check in the amount of $7,500 and he gave a check in the amount of $4,-500 to the Miners National Bank, which had supplied the balance of the purchase price or $18,000, after taking a mortgage on the property in that amount. The taxpayer's debt to the Miners National Bank was paid in full and his mortgage was thereupon released. All negotiations concerning the sale of the West River Street property were conducted between the taxpayer, Dr. Guttman and the Miners National Bank. The taxpayer's daughter, Claire Guttman, did not participate in any of these negotiations, nor was she a party to them. On Dr. Guttman's decision, title to the property was taken in the name of Dr. Guttman and Claire Guttman, his wife, as tenants by the entirety in accordance with the usual custom in Pennsylvania and in accordance with the custom of Dr. Guttman and his wife, who had taken title to all property acquired during their marriage, jointly. All of their bank accounts were held by Dr. Guttman, whose professional earnings supplied the funds, and his wife in their joint names, including his professional account. All of the moneys that went into these accounts were from Dr. Guttman's earnings.

At the time of her marriage to Dr. Guttman, Claire Guttman owned in her own name securities worth approximately $15,000, which were drawn upon while Dr. Guttman was pursuing his professional education and experience in his specialty to provide for the support of the family's living expenses. Of these securities, several thousand dollars worth were still owned by Claire Guttman at the time of the sale. After Dr. Guttman started his medical practice in 1945 his professional income was adequate and sufficient to support his family and himself in all respects. The taxpayer was never called upon and never did furnish any of the support of Guttman or his family, with the exception of an occasional gift of cash to his daughter upon occasions of her birthday, Christmas, etc.

Claire Guttman, as well as Dr. Guttman, signed the mortgage and accompanying bond in connection with the sale of the West River Street property and the simultaneous financing of the transaction by the Miners National Bank.

The case was originally tried by Judge Hill and was reviewed by the Tax Court in banc. Although the record is far from clear it appears that a majority of the judges of the court joined in a decision upholding the deficiency in the tax asserted by the respondent as a result of the disallowance of the alleged loss on the sale. Judge Opper, in an opinion concurred in by an undisclosed number of his colleagues, held the loss non-deductible under section 24(b) (1) (A) of the Code based upon his conclusion that the sale of the entire property must be regarded as having been made to the taxpayer's daughter. Judge Bruce, in an opinion joined in by Judges Murdock and Turner, concurred in the disallowance of the loss on the ground that the evidence did not establish that the taxpayer had ac-

tually suffered a loss. Judge Raum concurred in the result without opinion. Judge Hill, who saw and heard the witnesses, filed a dissenting opinion, joined in by Judges Arundell, Black, LeMire, Johnson and Tietjens, in which he concluded that the sale was in fact made to Dr. Guttman and not to his wife, that the taxpayer in fact suffered the loss which he claimed and that it was legally deductible by him for income tax purposes. Judge Van Fossan dissented without opinion. 21 T.C. 155.

■ The decision of the Tax Court must be reversed. Section 24(b) of the Internal Revenue Code in pertinent part provides:

"(b) Losses from sales or exchanges of property

"(1) Losses disallowed. In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—

"(A) Between members of a family, as defined in paragraph (2) (D);

\* \* \* \* \* \*

"(2) Stock ownership, family, and partnership rule. For the purposes of determining, in applying paragraph (1), the ownership of stock—

\* \* \* \* \* \*

"(D) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; \* \* \*."

Applying these statutory provisions to the case before us it will be seen that the loss, if any, which the taxpayer suffered upon the sale of the West River Street property was deductible by him for income tax purposes unless it was a sale between himself and his daughter, Claire Guttman. If it was a sale between himself and his son-in-law, Dr. Guttman, the loss was deductible, since a son-in-law is not within the class defined by section 24(b) (2) (D).[2] We are in complete accord with views expressed by Judge Hill in his dissenting opinion that the sale in this case was between the taxpayer and Dr. Guttman and that no sale in fact took place to Claire Guttman who supplied no part of the consideration for the sale and received her interest in the property as a tenant by the entirety purely as a gift from her husband. Indeed the findings of fact of the Tax Court compel this conclusion for the court found: "Dr. Guttman decided to, and did, purchase the house from the petitioner at a price of $30,000. \* \* \* The petitioner's daughter did not participate in any of these negotiations, nor was she a party to them."

■ The opinion filed by Judge Opper is based upon the proposition that under the law of Pennsylvania Claire Guttman became the owner of the entire property as a tenant by the entirety and accordingly was vendee of her father as to the whole property. The premise may be admitted but the conclusion sought to be drawn does not follow. For the fact that Mrs. Guttman acquired an estate by the entirety in the property under Pennsylvania law as a result of the direction of her husband that she be included as a grantee in the deed of conveyance did not make her, what in actual fact she was not, the purchaser of the property on a sale by her father, within the meaning of the Internal Revenue Code. As Judge Hill well said in his dissenting opinion, 21 T.C. 155, "the majority relies upon legal fiction in the effort to establish that a sale between the petitioner and his daughter was accomplished as a matter of law. The fiction relied upon belongs to the law of real property. It had its roots in the common law and was born centuries before income taxation was a gleam in the fiscal eye of government. This fiction argues that husband and wife are one. In the enactment and administration of revenue laws, fact rather than fiction is made to prevail." See Wisotzkey v. Commissioner of Internal Revenue, 3 Cir.1944, 144 F.2d 632, 636.

2. Topek v. Commissioner of Internal Revenue, 1947, 9 T.C. 763, 766.

Moreover, the contention proves too much. For if Mrs. Guttman is to be regarded as grantee of the whole property under the Pennsylvania law of tenancy by the entirety and therefore as sole purchaser from the taxpayer, her husband, Dr. Guttman, must likewise under the same law be regarded as grantee of the whole and, therefore, likewise sole purchaser. It is obvious that at this point the fiction of the Pennsylvania law breaks down so far as concerns its usefulness to solve the tax question which is before us and that the question can only be solved upon a practical view of the actual facts of the case, disregarding the fictions of the ancient law of real property.

Holding, as we do, that any loss which the taxpayer sustained in the sale of the West River Street property to Dr. Guttman was deductible by the taxpayer in computing his taxable income for 1948, we are next met with the question whether he in fact sustained any loss in the transaction. This depends upon whether on September 1, 1947, when he first rented the property, its fair market value was more than $30,000, the amount for which he sold it to Dr. Guttman in late 1948. Witnesses for the taxpayer testified that the value on September 1, 1947 was $60,000. A witness for the respondent on the other hand testified after some equivocation that the value was only $30,000.

The Tax Court made no finding as to the 1947 value although it appears that a majority of the judges who expressed their views upon the question, including the judge who took the testimony, found that the value was $60,000 as contended for by the taxpayer. This was the view taken by Judge Hill and the five judges who concurred with him. On the other hand only Judge Bruce and the two judges who concurred with him expressed the view that no loss had been suffered. Neither Judge Opper who wrote an opinion concurred in by an undisclosed number of other judges, Judge Raum who concurred in the result, or Judge Van Fossan who dissented, expressed any views on this question. Thus of the nine judges, a majority of the court in banc, who expressed their views six, a majority of that group, found the value to be $60,000. But the fact remains that six or, perhaps, seven of their brethren in the court in banc did not deem it appropriate to consider the question. Under these circumstances we think it proper for the case to go back for a definitive determination of the September 1, 1947 value.

■ In sending the case back to the Tax Court we deem it proper to direct the court's attention to its failure to disclose in its report the names of all the judges who participated in the review of the case by the court in banc. The Internal Revenue Code provides that the full court may, when so directed by the chief judge, review a decision proposed by a division of the court [3] and that a majority of the sixteen judges of the court shall constitute a quorum for this purpose.[4] It is an accepted principle of judicial procedure that a judicial tribunal should disclose on its public record the members of the tribunal who have participated in camera in its decisions.[5] Only thus can the parties know whether a quorum of qualified judges has decided their controversy. The need of such disclosure is particularly well illustrated by this case. For it is well known that judges of the Tax Court are constantly required to be absent from Washington to preside at hearings in other cities. Such judges may well not be able to participate in the review of a case by the full court while they are on circuit. And yet in this case at least fifteen of the sixteen judges must have participated since seven of them dissented from the decision which the court entered. The record discloses the names of twelve of

3. Internal Revenue Code of 1954, § 7460 (b), 26 U.S.C.A.

4. Internal Revenue Code of 1954, § 7444 (d), 26 U.S.C.A.

5. State ex rel. Hughes v. King, 1844, 27 N.C. 203; 21 C.J.S., Courts, § 183a.

these judges but neither we nor the parties know from the record how many others participated or who they were.

■■ The practice of the Tax Court in this respect appears to follow that of an administrative agency rather than that of a judicial tribunal. But although Congress in the Internal Revenue Codes has continued to call the tribunal "an independent agency in the Executive Branch of the Government" it has at the same time more realistically designated it as a court and its members as judges.[6] And it is the fact that from its inception as the Board of Tax Appeals in 1924 it has operated only as a judicial tribunal in adjudicating controversies as to tax liabilities arising between taxpayers and the Government.[7] Its powers are wholly judicial in character.[8] It has never been given any administrative powers or functions nor has it ever had any investigatory, regulatory or policy-making duties or powers. Since the passage of the Revenue Act of 1926 its decisions have been final and reviewable only on the record by the United States courts of appeals.[9] Since 1948 the scope of that review has been the same as in the case of like decisions of the district courts.[10] The Tax

6. Act of October 21, 1942, § 504(a), 56 Stat. 957, Internal Revenue Code of 1954, § 7441, 26 U.S.C.A.

7. The jurisdiction which the Tax Court has exercised since 1942 under the Renegotiation Acts is likewise judicial in nature, involving controversies between government contractors and the Government as to whether profits received by such contractors are excessive when measured by the standards laid down in the Acts. Maguire Industries v. United States, 1949, 86 F.Supp. 905, 114 Ct.Cl. 687, certiorari denied 340 U.S. 809, 71 S.Ct. 36, 95 L.Ed. 595.

8. Blair v. Oesterlein Mach. Co., 1927, 275 U.S. 220, 227, 48 S.Ct. 87, 72 L.Ed. 249; Helvering v. Lazarus & Co., 1939, 308 U.S. 252, 255, 60 S.Ct. 209, 84 L.Ed. 226; Uncasville Mfg. Co. v. Commissioner of Internal Revenue, 2 Cir., 1932, 55 F.2d 893, 897, certiorari denied 286 U.S. 545, 52 S.Ct. 497, 76 L.Ed. 1282; Commissioner of Internal Revenue v. Liberty Bank & Trust Co., 6 Cir., 1932, 59 F.2d 320, 323; Helvering v. Continental Oil Co., 1933, 63 App.D.C. 5, 68 F.2d 750, 753, certiorari denied 292 U.S. 627, 54 S. Ct. 629, 78 L.Ed. 1481; Irwin v. Larson, 5 Cir., 1938, 94 F.2d 187, 190.

9. In reporting to the House of Representatives the bill which became the Revenue Act of 1926 the Committee on Ways and Means said:
"In the view of the committee the decisions of the board are judicial and not legislative or administrative determinations. Review of judicial decisions may be had by direct appeal to the courts as well as by petitions to the courts for the enforcement of an administrative order, or by extraordinary remedy and suits for refunds. Further, no rehearing need be provided before the reviewing court, and the review of the decision of the board may be limited to the record made before the board. The imposition upon the court of the duty of reviewing judicial decisions, such as those of the board, is not the imposition of a nonjudicial duty * * *." House Report No. 1 on H.R. 1, 69th Cong. 1st Sess., p. 20.

10. This was accomplished by section 36 of the Act of June 25, 1948, 62 Stat. 991, which amended section 1141(a) of the Internal Revenue Code of 1939, 26 U.S. C.A. § 1141(a), so as to make the decisions of the Tax Court reviewable by the courts of appeals "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury". It is clear that by this action Congress intended (see Senate Report No. 1559 on H.R. 3214, 80th Cong., 2d Sess., pp. 2, 13) to repeal the rule laid down in Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, which had severely limited the scope of review of Tax Court decisions upon the theory that the court was a specialized administrative body. Congress thus made plain that it regarded the Tax Court as a judicial tribunal rather than an administrative agency and intended that its decisions should be subject to the same review accorded judicial decisions.
This action by Congress following its previous action in 1942 in calling the agency a court and its members judges rendered obsolete Chief Justice Taft's early dictum in Old Colony Trust Co. v. Commissioner of Internal Revenue, 1929, 279 U.S. 716, 725, 49 S.Ct. 499, 502, 73 L.Ed. 918, that "The Board of Tax Appeals is not a court. It is an executive or administrative board, upon the decision of which the parties are given an opportunity to base a petition for review to the courts after the administrative inquiry of the Board has been had and decided."

Court is thus for all practical purposes a judicial tribunal operating in the federal judicial system. Whether it is a legislative court created by Congress under Article I, section 8, of the Constitution, like the Customs Court, or some other form of judicial agency placed for convenience of housekeeping in the Executive Branch of the Government is, therefore, merely a matter of legal semantics since, whatever it may be called, it is an "independent" judicial agency the work of which is not subject to supervision or review in the Executive Branch of the Government but only by the federal appellate courts. The court should accordingly follow accepted forms of judicial procedure by indicating in some appropriate way on its record in each case reviewed by the full court the names of the judges who participate in the decision ultimately rendered.

The decision of the Tax Court will be reversed and the cause will be remanded for further proceedings not inconsistent with this opinion.

Hartigan, Circuit Judge, dissented.
See also D.C., 111 F.Supp. 745.