Josephine C. TOSCANO aka Josephine C. Zelasko, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 24595.

United States Court of Appeals, Ninth Circuit.

April 28, 1971.

Byrne, District Judge, dissented and filed opinion.

George H. Zeutzius (argued), Pasadena, Cal., for petitioner-appellant.

Grant W. Wiprud (argued), Lee A. Jackson, Elmer J. Kelsey, Issie L. Jenkins, Attys., Johnnie M. Walters, Asst. Atty. Gen., Tax Div., K. Martin Worthy, Chief Counsel, I. R. S., Washington, D. C., for respondent-appellee.

Before CHAMBERS and DUNIWAY, Circuit Judges, and BYRNE, District Judge.*

DUNIWAY, Circuit Judge:

This case presents two questions:

1. Did the Tax Court have jurisdiction, after its decision had become final under 26 U.S.C. § 7481, to grant leave to

---

* Honorable William M. Byrne, United States District Judge, Central District of California, sitting by designation.

file a motion to vacate its decision on the ground of fraud on the court?

2. If the Tax Court had such jurisdiction, should it have granted leave and afforded the taxpayer an evidentiary hearing in this case? We answer both questions in the affirmative and remand to the Tax Court for further proceedings.

The question arises in this way. One John J. Toscano, with whom petitioner Josephine C. Zelasko was then living, but to whom she claims that she was never married, filed joint income tax returns for the two of them, as husband and wife, for the years 1946 through 1950. The Commissioner assessed deficiencies. A joint petition was filed with the Tax Court, and a settlement stipulation was filed with that court, on the basis of which deficiencies were determined for 1947, 1949, and 1950. Decision was entered March 28, 1955. It became final three months later (26 U.S.C. § 7483), no petition for review having been filed (26 U.S.C. § 7481).

Miss Zelasko alleges, and has submitted considerable documentary evidence to support her allegations, that she never was married to Toscano. She says that her signatures on the joint returns were either forged by Toscano, or were placed there by her under duress. The duress consisted of either the threat of brutal physical beatings, or actual beatings. Toscano ran a restaurant in Los Angeles at various locations from 1943 or 1944 until 1954. Miss Zelasko never had any interest in Toscano's ventures and received none of their profits. She did all the cooking, cleaning and scrubbing at the restaurants, slept on a cot in the restaurant building, and lived in constant fear of Toscano. In 1954, Toscano moved to Nevada, where he lived with another woman.

While Miss Zelasko and Toscano were living in Los Angeles, he represented that they had been married in Arkansas in 1943, while he was stationed there in the army. Her counsel, however, presented evidence that demonstrates that no such marriage occurred. Nor were they ever married in California or elsewhere. In 1954 Toscano obtained a Nevada divorce from Miss Zelasko. He alleged a 1943 Arkansas marriage. An answer to his complaint was filed by a Las Vegas attorney, purporting to appear for Miss Zelasko. However, he had no authority to do so, and she never signed any appearance, never had any contact with the attorney, and never authorized him to appear for her.

In 1953, the Commissioner assessed deficiencies against Toscano and his "wife," Miss Zelasko. She, however, never received or saw a copy of the notice of deficiencies. Toscano, on October 7, 1953, filed a joint petition for redetermination. The Commissioner answered, and on January 18, 1954, Toscano filed a joint reply. He told his attorney that he and Miss Zelasko had been married in Arkansas. On March 21, 1955, Toscano permitted his attorney to enter into a stipulation with the Commissioner, on a joint return basis. The stipulation admitted certain deficiencies. This is the basis for the Tax Court decision.

Toscano died in 1962. The Commissioner then sought to collect from Miss Zelasko—attempts which finally resulted in the present proceedings.[1] Miss Zelas-

---

1. The present proceeding is not Miss Zelasko's first attempt to obtain relief. On January 23, 1964, she filed an action in the United States District Court for the District of Nevada at Las Vegas, seeking to enjoin the District Director of Internal Revenue from attempting to collect the deficiencies from her. The District Court dismissed, Enterprises Unlimited, Inc. v. Davis, 1964, 64–1 U.S.T.C. ¶ 9431, and we affirmed, Enterprises Unlimited, Inc. v. Davis, 9 Cir., 1965, 340 F.2d 472. We pointed out that a civil action for a refund was available, and that the District Court has no jurisdiction to review the decision of the Tax Court. Thereafter, the deficiency assessment for 1949 was paid, and an action for refund was filed. This was dismissed without prejudice, by stipulation, so that relief could

ko alleges that she has no recollection of signing the petition or any paper that was filed with the Tax Court, that she did not knowingly participate in the Tax Court proceedings, and that, until the Commissioner levied on her assets, she had no knowledge that any deficiencies had been assessed against her.

1. *Can the Tax Court Reopen its Decision On the Basis of Fraud On the Court?*

■ Section 7481 of the Internal Revenue Code, 26 U.S.C., contains an elaborate set of rules as to when a decision of the Tax Court is final. It covers all stages of review, from failure to petition the Court of Appeals for review (subsection (1)), applicable here, through various stages of review, including review by the Supreme Court and proceedings on remand from that Court. The legislative history shows that Congress was conscious of the need that "finality" be clearly defined, so that the process of collection can proceed unimpeded. Court decisions, supporting this objective, have been strict in applying the statute.

The Supreme Court has held that it cannot entertain a petition for rehearing in a case in which it had affirmed the Board of Tax Appeals, when the petition is filed after the Board's statutory finality date, but during the time for filing a petition for rehearing established by the Court's Rules. Helvering v. Northern Coal Co., 1934, 293 U.S. 191, 55 S.Ct. 3, 79 L.Ed. 281. See also R. Simpson & Co. v. C.I.R., 1944, 321 U.S. 225, 64 S.Ct. 496, 88 L.Ed. 688; Lasky v. C.I.R., 1957, 352 U.S. 1027, 77 S.Ct. 594, 1 L.Ed.2d 598, aff'g per curiam, 9 Cir., 1955, 235 F.2d 97. The Courts of Appeals have been equally strict. They have held that once statutory "finality" has attached, the Tax Court (or Board of Tax Appeals) cannot reopen on any of various grounds that have been urged: fraud, Jefferson Loan Co. v. C.I.R., 8 Cir.,

1957, 249 F.2d 364; reformation of a stipulation, Lentin v. C.I.R., 7 Cir., 1957, 243 F.2d 907; *id*, 237 F.2d 5; newly discovered evidence, Kutner v. C.I.R., 7 Cir., 1957, 245 F.2d 462; excusable neglect, Lasky v. C.I.R., 9 Cir., 1956, 235 F.2d 97, affirmed, 1957, 352 U.S. 1027, 77 S.Ct. 594, 1 L.Ed.2d 598; Monjar v. C.I.R., 2 Cir., 1944, 140 F.2d 263; McCarthy v. C.I.R., 7 Cir., 1943, 139 F.2d 20; intervening change in the law, White's Will v. C.I.R., 3 Cir., 1944, 142 F.2d 746; Denholm & McKay Co. v. C.I.R., 1 Cir., 1942, 132 F.2d 243; Sweet v. C.I.R., 1 Cir., 1941, 120 F.2d 77; failure of Commissioner to follow mandate of the Circuit Court of Appeals, Crews v. C.I.R., 10 Cir., 1941, 120 F.2d 749; ground not stated, Swall v. C.I.R., 9 Cir., 1941, 122 F.2d 324. Nor can a comparable result be had by an independent lawsuit, Schaffner v. Bingler, 3 Cir., 1959, 268 F.2d 76 (alternative holding); Jefferson Loan Co. v. Arundell, 1959, 106 U.S.App.D.C. 370, 273 F.2d 105.

There are but three cases to the contrary: Kenner v. C.I.R., 7 Cir., 1968, 387 F.2d 689, involving claimed fraud on the court, Reo Motors, Inc. v. C.I.R., 6 Cir., 1955, 219 F.2d 610, involving mutual mistake, and La Floridienne J. Buttgenbach & Co. v. C.I.R., 5 Cir., 1933, 63 F.2d 630, where there was a stipulation to reopen. This court in *Lasky, supra,* which was affirmed by the Supreme Court, criticized and refused to follow *Reo Motors* and *La Floridienne, supra,* we also criticized *La Floridienne* in *Swall, supra.* So did the First Circuit in *Sweet, supra.* The Second Circuit in *Monjar, supra,* distinguished it as a consent case; the Third expressed doubts about it in *White's Will, supra.*

So far as we know Kenner v. C.I.R., *supra,* has not yet been criticized by any court. The *Kenner* opinion states that the Tax Court does have jurisdiction to set aside a final decision for fraud on the court. It bases this view in part on several cases that state that the Tax

be sought in the Tax Court. The refund action was refiled on July 7, 1968, and

is still pending, the Court having stayed it pending the present appeal.

Court is (now, at least) more than a mere administrative agency, as we described it in *Lasky*, but in fact exercises judicial powers, Stern v. C.I.R., 3 Cir., 1954, 215 F.2d 701, 707–708; Reo Motors v. C.I.R., *supra*; Fairmount Aluminum Co. v. C.I.R., 4 Cir., 1955, 222 F.2d 622; Louisville Builders Supply Co. v. C.I.R., 6 Cir., 1961, 294 F.2d 333; MacRae v. Riddell, 9 Cir., 1965, 350 F.2d 291. Thus the Tax Court differs from its predecessor, the Board of Tax Appeals, which was held not to be a court and to have no equitable powers. C.I.R. v. Gooch Milling & Elev. Co., 1943, 320 U.S. 418, 64 S.Ct. 184, 88 L.Ed. 139. None of the cases cited in *Kenner*, however, involved setting aside a final decision, except *Reo Motors*, which was not followed by us or by the Supreme Court in *Lasky*. And *Louisville Builders Supply* denied one equitable power to the Tax Court, the power to order the taking of a deposition in anticipation of a case that might later come before it. Thus precedent for the view of the *Kenner* court is sparse. It concluded that a decision obtained by fraud on the Tax Court can be set aside by it at any time because it is not a decision at all—a view strongly supported, as applied to the Court of Appeals, by the Supreme Court in Hazel-Atlas Glass Co. v. Hartford Empire Co., 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250. And it relied in part on the fact that the Commissioner conceded that the power exists. However, *Kenner* also held that fraud on the court had not been shown.

The Commissioner makes the same concession as to the power of the Tax Court here, citing *Kenner*. Under these circumstances, we hold that the Tax Court can, after its decision becomes final, set it aside on the narrow ground of fraud on the court, as expounded in *Hazel-Atlas, supra*.

2. *Should the Tax Court Have Exercised its Power Here?*

■ The Tax Court's Rule 19(f) provides:

"(f) No motion to vacate or revise a decision may be filed more than 30 days after the decision has been entered, except by special leave."

Miss Zelasko's motion was for "special leave" under this rule. The Tax Court denied leave. In so doing, that court indicated that it believed that, assuming the truth of Miss Zelasko's allegations, she had not shown a fraud on the court, but merely a fraud on herself or on the Commissioner. If that view is correct, then the decision must be affirmed. We are of the opinion, however, that the allegations of the motion and of the supporting documents do show a fraud on the Tax Court.

The distinction between "fraud" on the one hand and "fraud on the court" on the other is by no means clear, and most attempts to state it seem to us to be merely compilations of words that do not clarify. Mr. Moore has made a valiant attempt at definition in the portion of his treatise that deals with Rule 60(b), F.R.Civ.P., which uses the phrase "fraud upon the court." He discusses the problem at length (7 Moore's Federal Practice, 2d ed. 1970, § 60.33, pp. 504–13), and concludes as follows (p. 512–13):

" 'Fraud upon the court' should, we believe, embrace only that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjuding cases that are presented for adjudication. Fraud, *inter partes*, without more, should not be a fraud upon the court, but redress should be left to a motion under 60(b) (3) or to the independent action."

Because there is here no charge of corruption of the court itself (*cf.* Root Refining Co. v. Universal Oil Products Co., 3 Cir., 1948, 169 F.2d 514), we do not find the foregoing very helpful. What is meant by "defile the court itself"? What is meant by "fraud perpetrated by officers of the court"? Does

this include attorneys? Does it include the case in which an attorney is deceived by his client, and is thus led to deceive the court? The most that we can get out of Moore's definition is that the phrase "fraud on the court" should be read narrowly, in the interest of preserving the finality of judgments, which is an important legal and social interest. We agree, but do not find this of much help to us in deciding the question before us.

This court and others have also attempted definitions. In Keys v. Dunbar, 9 Cir., 1969, 405 F.2d 955, 957–958 we said that "the acts of the adverse party 'must be such as prevented the losing party from fully and fairly presenting his case or defense,'" citing Atchison, Topeka and Santa Fe Railway Co. v. Barrett, 9 Cir., 1957, 246 F.2d 846, 849, where we said the same thing. Neither case is comparable to the present case; each involved a claim that false evidence had been presented; in each, the complaining party had had a chance to meet it. In each, relief was denied. In England v. Doyle, 9 Cir., 1960, 281 F.2d 304, 309, we said that "it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision." We found no such scheme there. The problem is, how broadly is the foregoing language to be read? See also Independence Lead Mines Co. v. Kingsbury, 9 Cir., 1949, 175 F.2d 983, which involved a stipulated judgment in a contested case. The present case seems to us to fall within the Keys and Barrett language. Miss Zelasko's claim is that she was prevented from presenting her defense at all, much less fully or fairly.

The Second Circuit, in Martina Theatre Corp. v. Schine Chain Theatres, Inc., 1960, 278 F.2d 798, 801, quoted and applied Moore's language to a dismissal of an action pursuant to stipulation, and denied relief. But there, both parties were before the court; one claimed that it had been deceived by the other. The court felt that the moving party had also been guilty of deception. Here, Miss Zelasko claims that she was never really before the court. If what she claims is true, she can hardly be accused of deceiving the court. See also Hawkins v. Lindsley, 2 Cir., 1964, 327 F.2d 356, 359, which cites and follows Martina Theatre in a somewhat comparable situation.

As Mr. Moore recognizes, the leading case dealing with fraud on the court is Hazel-Atlas Glass Co. v. Hartford-Empire Co., 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250. We think that the case before us falls within the principles there applied, whatever words may be used to describe them. In Hazel-Atlas, a party seeking a patent, when "confronted with apparently insurmountable Patent Office opposition," procured the publication in a trade journal of an article purportedly by a supposedly distinguished expert, but actually written by the party's attorney, describing the device as a remarkable advance in the art. The patent issued. Later, the patentee sued for infringement. It lost in the District Court. On appeal, it relied heavily on the spurious article and obtained a reversal. The losing party, following an investigation and long after the judgment was final, moved in the Court of Appeals for an order permitting it to seek, in the District Court, an order setting aside the judgment entered pursuant to the mandate of the Court of Appeals. The motion was denied. On certiorari, the Supreme Court reversed, directing the Court of Appeals to set aside its judgment, recall its mandate, dismiss the original appeal, require reinstatement of the original judgment, and take other appropriate action. In so doing, the court said (pp. 245–246, 64 S.Ct. at p. 1001):

"Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hart-

ford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals. *Cf.* Marshall v. Holmes, 141 U.S. 589, 12 S.Ct. 62, 35 L.Ed. 870, *supra.* Proof of the scheme, and of its complete success up to date, is conclusive. *Cf.* United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93, *supra.* And no equities have intervened through transfer of the fraudulently procured patent or judgment to an innocent purchaser. *Cf. Ibid*; Hopkins v. Hebard, 235 U.S. 287, 35 S.Ct. 26, 59 L.Ed. 232."

The Court also held that the moving party was not barred by lack of diligence, although it took over 10 years to uncover the fraud after first becoming suspicious. The Court said (p. 246, 64 S.Ct. at p. 1001):

"But even if Hazel did not exercise the highest degree of diligence, Hartford's fraud cannot be condoned for that reason alone. This matter does not concern only private parties. These are issues of great moment to the public in a patent suit. Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363. Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."

In the case before us, the original fraud was not upon the Tax Court, but upon the Commissioner, just as in *Hazel-Atlas* it was upon the Patent Office. It is alleged that Toscano had income but that Miss Zelasko had none. If Toscano was not married to Miss Zelasko, he had no right to file joint returns. Filing joint returns was an obvious way for him to make it appear that he owed less taxes than the law required him to pay. It is alleged that to obtain this result he resorted to both forgery and duress. Moreover, if he was not married to her, she was not liable for his taxes. Thus he perpetrated two frauds, one upon the Commissioner, the other on Miss Zelasko.

The spurious claim of an Arkansas marriage and the spurious Nevada divorce both would lend verisimilitude to the claimed right to file joint returns, whatever other considerations may also have motivated them. They are somewhat analogous to the things that went on while the fraud in *Hazel-Atlas* was being investigated. See 322 U.S. at 241–243, 64 S.Ct. 997.

When a deficiency was assessed, and Toscano petitioned the Tax Court for redetermination, he carried the fraud into the Tax Court. Thus he was continuing to defraud the Commissioner, and he was continuing to attempt to subject Miss Zelasko to a liability that was not hers. But he was doing more; he was also perpetrating a fraud upon the Tax Court, which culminated in a determination of joint deficiencies against Miss Zelasko as well as himself. This, we think, was as much a fraud on the court as was the use of the spurious article in the Court of Appeals in *Hazel-Atlas*.

We have heretofore held that if a husband procures his wife's signature in a joint return by duress, this is a fraud upon the wife, and warrants setting aside a deficiency assessed against her. Furnish v. C.I.R., 1958, 262 F.2d 727, 733–734.[2] The second circuit has held

---

2. Persons who are not married have no right to file joint returns, thereby reducing their taxes. See Gersten, 1956, 28 T.C. 756, 770–771, aff'd, 9 Cir., 1959,

that a joint return filed by the husband but not signed by the wife, or bearing a forgery of her signature, or bearing her signature given under duress, cannot impose liability upon her for his taxes. Bauer v. Foley, 2 Cir. 1968, 404 F.2d 1215, and supplemental opinion, 1969, 408 F.2d 1331.[3] In that case, the joint notice of deficiency was mailed only to the husband, under 26 U.S.C. § 6212(b)(2) (1964 ed.). The court did not disapprove this practice in the usual case, where the return is in fact joint. But it did say, 404 F.2d at p. 1220:

> "But the basic issue is not whether the Government had a right to compute and send out a notice of deficiency before it had examined into and discovered whether or not the signatures on the returns were genuine and that the filing was not the result of duress—a procedure which would impose an intolerable burden on the collection of taxes—but was, rather, whether or not the taxpayer wife, after gaining actual knowledge of the assessment, long after the only statutory remedy which she could invoke had expired, had a right to be heard and an opportunity to show that her signatures had been forged or obtained by duress.

> "The consequence of the Government's and the lower court's interpretation of the applicable statutes to the facts of this case is that, so long as a § 6212(b)(2) notice is mailed, a taxpayer wife is irrevocably bound by the forgery and duress of her husband and is subject to having all of her property confiscated by the Government, though she never had any taxable income of her own, and never became party to a joint return. This is to say that, even if the taxpayer can conclusively prove that her signature was forged or a joint return containing her signature was signed and filed under duress, she still, as a matter of

law, is liable for the tax on her husband's income. But a single joint notice of deficiency is effective in imposing liability only '[i]n the case of a joint income tax return *filed by husband and wife.* * * *' (Emphasis added.) We think that this language means that the return contains the genuine signatures of both, unless signed by a duly authorized agent, and that neither was made under duress and that both intended that it be filed as the law requires. Moreover, it seems unreasonable to hold that Congress had in mind that the mailing of a single joint notice would operate, in the case of a forged or coerced joint return, to bar the party having no knowledge of it during the period for petitions for redetermination from ever being heard. Such a harsh result would conflict with the well-established objective of the notice provisions which is fairness to the taxpayer in affording him the opportunity to challenge an alleged deficiency in the Tax Court before he has to pay it. See, *e. g.*, DeWelles v. United States, 378 F.2d 37, 38–39 (9 Cir., 1967)."

Here, Miss Zelasko claims that the fraud was carried forward by Toscano's having his attorney stipulate to joint deficiencies, on the basis of which the decision was entered. She disclaims retaining the attorney or authorizing him to stipulate in her behalf. If she can prove these claims, she has never had her day in court.

█ The Commissioner also argues that the Tax Court's decision should be upheld on an independent ground, that the Court has discretion to grant or deny leave under its rule, and that it properly exercised that discretion. It argues that there was "gross neglect" in not filing the motion sooner, and that the record shows that Miss Zelasko knowingly joined in the stipulation. As to the first argument, what the Supreme

---

267 F.2d 195, 199–200; Estate of Buckley, 1962, 37 T.C. 664, 672–673; Untermann, 1962, 38 T.C. 93; Borax, 1963, 40 T.C. 1001, 1009–1010.

3. See also Brown, 1968, 51 T.C. 116.

Court said in *Hazel-Atlas, supra,* is pertinent. As to the second, we think that Miss Zelasko's showing is strong enough to require a hearing. In this case, as in *Furnish, supra,* we think that the Tax Court should determine the issues raised on their merits.

The decision of the Tax Court is vacated with directions to grant leave under its Rule 19(f), to hold an evidentiary hearing, and for further proceedings consistent with this opinion.

BYRNE, District Judge:

I respectfully dissent.

This case presents a graphic illustration of how litigants in their efforts to avoid the finality of judgments, contribute to the log jam in our courts resulting from repetitious hearings.

On July 15, 1953, the Commissioner of Internal Revenue determined deficiencies in the income taxes of John J. Toscano and Josephine Toscano as husband and wife. This determination was reached after reviewing the Toscanos' joint returns for the years 1946 through 1950. *John and Josephine Toscano jointly petitioned* the Tax Court for a redetermination of the said deficiencies.

On March 21, 1955, John and Josephine, through their attorney, Franklin C. Laven, filed a settlement stipulation with the Tax Court. The petitioners stipulated to deficiencies and additions for the years 1947, 1949 and 1950; the years 1946 and 1948 were deemed to be free of such deficiencies. *The Tax Court entered a decision pursuant to the stipulation.*

After John Toscano's death in July, 1962, the Commissioner sought to collect from Josephine. This Court, in 1965, rejected the contention of Josephine and her wholly owned corporation, that the Commissioner should be enjoined from making such collection. Enterprises Unlimited, Inc., v. Davis, 340 F.2d 472 (CA 9, 1965).

Josephine paid the taxes owed for the taxable year 1949 and then filed a refund action in Nevada. This suit was dismissed without prejudice and a second suit filed. As of April, 1970, it is still pending in the Nevada District Court.

On July 1, 1968, Josephine moved for special leave, pursuant to Rule 19(f) of the Tax Court Rules of Practice, to file, out of time, a motion to vacate the Tax Court's 1955 decision. The thrust of this motion is that the decision rendered fifteen years earlier pursuant to a stipulation of the parties, was procured by fraud on the Court. In support of her claim appellant alleges she was never married to Toscano, and despite the fact that they represented they were man and wife, and that during most of the many years they lived together, they occupied a single bedroom, she slept alone on a sofa.

The record discloses that appellant signed the petition which was filed with the Tax Court. Indeed, Franklin C. Laven, the attorney who represented the petitioners before the Tax Court, testified at a deposition taken February 13, 1967, that John and Josephine both participated in discussions with him relative to the Tax Court petition. Given this kind of evidence, it seems anomalous to ask any court to rule some fifteen years after the event, that the appellant did not understand the nature of her acquiescence to the Tax Court's action.

A hearing on the appellant's motion for special leave to file a motion to vacate the Tax Court decision of 1955 was held on August 21, 1968. Affidavits and 25 exhibits were presented in evidence by the appellant in support of her motion to vacate. On May 19, 1969, the Tax Court filed its opinion and findings including the following:

"Even if true, we do not believe that the allegations stated in the motion add up to fraud on the Court so that we would be justified in vacating the 1955 decision. At the very least it must be established clearly and convincingly that the former decision was obtained as a *direct* result of fraud

and it should also be shown that the fraudulent conduct was deliberately undertaken to influence the Court in its decision. But the issue before the Court in 1955 was simply the correctness of petitioners taxable income over a period of 5 years determined by respondent under the net worth method. The decision was entered under a written stipulation of the parties with deficiencies and additions to tax for only 3 of the 5 years involved. It is not shown that the decision was in any way obtained by deliberately perpetrated fraud on anyones part.

"The marital status of the petitioners was never in issue and hence never before the Court. It is difficult to see how there could be fraud on the Court under these circumstances."

The Tax Court noted the passage from *Hazel-Atlas* in which the Supreme Court described the nature of the fraud perpetrated upon the Third Circuit: "This is not simply a case of a judgment obtained with the aid of witnesses who on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here * * * we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals."

Here the evidence presented at the hearing showed no "deliberately planned and carefully executed scheme to defraud * * * the * * * Court." As the Tax Court stated, "The marital status of the petitioners was never in issue and hence never before the Court."

This Court's review is limited to the narrow issue of determining whether the Tax Court's denial of special leave was an abuse of the discretion vested in the Tax Court. Lentin v. Commissioner of Internal Revenue, 243 F.2d 907 (CA 7, 1957), Skenandoa Rayon Corp. v. Commissioner of Internal Revenue, 122 F.2d 268 (CA 2, 1941) cert. den. 314 U. S. 696, 62 S.Ct. 413, 86 L.Ed. 556 (1941); McCarthy v. Commissioner of Internal Revenue, 139 F.2d 20 (CA 7, 1943). But the majority spurn this issue with a single sentence. "As to the first argument, what the Supreme Court said in *Hazel-Atlas*, supra, is pertinent."

*This issue was not in Hazel-Atlas.* In this motion *for special leave* pursuant to Rule 19(f), the denial of the motion was within the sound discretion of the Tax Court and the only grounds for review by this Court is abuse of discretion by the Tax Court (See authorities cited above).

Though the Tax Court held a hearing, received evidence and found that there was no fraud on the Court in 1955, this Court now directs it to hold another evidentiary hearing.

Though I believe the Tax Court properly decided the issue before it, what really bothers me is that this Court, without any substantial basis to hold that the trial court abused its discretion, remands the case to the lower court to repeat its former hearing.

The only distinction between the evidentiary hearing held by the Tax Court and the one ordered by this Court is the first was a hearing on a motion "for special leave" [1] to file a motion to vacate and revise the 1955 decision of the Tax Court, and the hearing ordered by this Court is on a motion to vacate or revise the 1955 decision. The evidence presented on the motion ordered by this Court will unquestionably be substantially the same as the affidavits and 25 exhibits offered by the taxpayers and received by the Court at the prior hearing.

Is the Tax Court to retain its function as the trier of facts? If so, its decision will undoubtedly be the same. Or is this Court substituting its judgment for that of the trial court? If so, why go through the motions of repeating the hearing?

As I view it, there has been no showing of abuse of discretion by the Tax Court and I would affirm.

[1.] Rule 19(f) reads: "No motion to vacate or revise a decision may be filed 30 days after the decision has been entered, except by special leave."