Theodore R. **KUPFERMAN**, as Receiver of Vickers, Christy & Co., Inc., Plaintiff-Appellee,

v.

**CONSOLIDATED RESEARCH AND MANUFACTURING CORPO-RATION**, Defendant,

Daniel Jacobson, Petitioner-Appellant.

No. 591, Docket 71–2171.

United States Court of Appeals, Second Circuit.

Argued April 10, 1972.

Decided May 3, 1972.

As Corrected May 12, 1972.

I. Arnold Ross, New York City, for plaintiff-appellee.

Robert S. Warshaw, New York City (Trubin Sillcocks Edelman & Knapp, New York City, of counsel), for petitioner-appellant.

Before FRIENDLY, Chief Judge, and SMITH and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

■■ This is a troubling appeal. At issue is a 1962 judgment of the District Court for the Southern District of New York awarding the receiver of Vickers, Christy & Co., Inc. (Vickers Christy), an underwriter, damages of $136,500, with interest, against Consolidated Research and Manufacturing Corporation (Consolidated) for the latter's breach of an agreement to file a post-effective amendment with respect to shares issuable to Vickers Christy if the underwriting was successfully completed. Consolidated did not appeal the 1962 judgment. On September 24, 1971, Daniel Jacobson, a former director of Consolidated who

has been sued on a related matter in the New York courts, moved, on behalf of Consolidated and himself, to have the 1962 judgment vacated [1] on the ground that the court would not have entered it if the judge had been aware of a release executed by Vickers Christy in favor of Consolidated, which was known to the receiver's attorney but not to the defendant's. Jacobson now appeals from the denial of that motion, 53 F.R.D. 387 (S.D.N.Y.1971). Despite the attractiveness of appellant's argument, close examination of the record has led us to conclude that the strong policy in favor of the finality of judgments justified the court's refusal to grant relief.

I.

The controversy stems from an agreement dated August 22, 1960, wherein Vickers Christy, as underwriter, undertook to use its best efforts to sell 50,000 units, each consisting of one share of Class A and one of Class B stock of Consolidated at $6.50 per unit. If all the shares were sold within 45 days of the date of a post-effective amendment to the registration statement, Vickers Christy was to receive a commission of 65 cents per unit, and $10,000 for expenses. In addition the agreement provided:

You [Vickers Christy] shall have the right and obligation to purchase from the Company, and the Company shall sell to you, 6,250 shares of Class A stock and 6,250 shares of Class B stock at a price of $1.00 per share. In this connection, the Company agrees that it shall prepare and file at its expense a further post-effective amendment to the Registration Statement and Prospectus so that any of said 12,500 shares may be offered by

---

1. Since Consolidated appears to be defunct, Jacobson is the real party in interest. Although it would have been more orderly if he had sought intervention pursuant to F.R.Civ.P. 24, a finding of fraud on the court empowers the district court to set aside the judgment *sua sponte*, see Root Refining Co. v. Universal Oil Products Co., 169 F.2d 514, 521–522 (3 Cir. 1948), cert. denied sub nom., Universal Oil Products Co. v. William Whitman Co., 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444 (1949), and we certainly cannot say that Jacobson lacked standing to suggest that it do so. Cf. Martina Theater Corp. v. Schine Chain Theaters, Inc., 278 F.2d 798, 801 (2 Cir. 1960) ; 7 Moore, Federal Practice ¶ 60.33 at 507 (1971 ed.).

you in compliance with the applicable provisions of the Act.[2]

The underwriting was not a peaceful one. Vickers Christy complained that Consolidated had misrepresented that it had commitments for a substantial number of units. Consolidated's financial condition was so poor that it prevailed upon Vickers Christy to release proceeds of subscriptions which, under the underwriting agreement incorporated in the registration statement, were to be held in escrow pending completion of the underwriting. At that time, Consolidated also agreed to remove the 45 day limitation on Vickers Christy's selling period. Some of the checks transmitted by Vickers Christy seem to have bounced. However, all the units were sold by December, 1960. Apparently no one paid much heed at that time to just when the sale of the 12,500 shares to the underwriter should occur.

Vickers Christy had other subjects for concern. On January 25, 1961, the SEC inspected its books and records pursuant to § 17(a) of the Securities Exchange Act. The investigation revealed that the firm's books were not current, that at December 30, 1960, its liabilities exceeded its assets by $71,311 and that an additional $82,820 of capital was needed to comply with the SEC's then operative net capital rule, 17 C.F.R. 240.15c 3–1 (1961). Because of these violations the SEC brought an action, in the District Court for the Southern District of New York, to enjoin the firm from engaging in the securities business. On advice of counsel, Vickers Christy stopped transacting business, and its principals devoted themselves to attempting to correct the deficiencies set forth in the SEC's complaint before the hearing, which had been scheduled for February 22, 1961.

It was at that time that the 12,500 Consolidated shares began to appear as the pot of gold at the end of the rainbow which might solve the underwriter's problems. Apparently the issue had become "hot"; by February 10, 1961, the bid price in the OTC market had risen to $18 per share. Vickers' special counsel advised that the 12,500 shares could be carried in its trading account at a 30% discount, even though they could not be then sold to the public. Vickers seems to have lacked the wherewithal to buy them. Daniel Lieberman, an accountant, agreed to provide $9,500 of the total purchase price in consideration of being allowed to retain 4,500 shares. Consolidated, however, was dragging its feet with respect to issuing the shares, avowedly because of its belief that Vickers had violated the underwriting agreement. In an effort to overcome Consolidated's reluctance, Vickers, on February 3, 1961, wrote:[3]

We wish to further advise you that it was not the intention heretofore or hereafter to make a public distribution of these units. Therefore, it will not be necessary to file a post-effective amendment as outlined on the cover page of the said Prospectus.

The sale of the 12,500 shares to Lieberman and his partial transfer to Vickers Christy were consummated on February 10, 1961. A number of documents were

2. A further post-effective amendment was needed because of the SEC's construction of § 6(a) of the Securities Act of 1933 as limiting registration to securities presently proposed to be offered. See 1 Loss, Securities Regulation 296–99 (2d ed. 1961). There was no intention to issue the 12,500 shares unless the underwriting of the 50,000 units covered by the initial registration was completed.

3. On March 19, 1964, Friedman & Friedman, Consolidated's former corporate counsel, wrote Francis J. Purcell, the company's trial counsel in the 1962 litigation, that, among other things, the counsel for the receiver of Vickers Christy came into possession of the February 3 letter in late April, 1962, a date prior to trial of the 1962 litigation. The receiver's counsel has consistently contended that he first learned of the February 3 letter sometime in 1964. Appellant apparently accepts these representations; he does not contend here, nor did he contend below, that the receiver's counsel was aware of the February 3 letter in 1962.

exchanged. Vickers Christy addressed a letter to Consolidated stating:

This is to inform you that we have assigned to Mr. Daniel Lieberman our 12,500 shares of Consolidated Research & Manufacturing Corporation which we are entitled to purchase at $1.00 per share as per the prospectus, and we have released Consolidated Research & Mfg. Corp. from all obligations and liabilities.

Lieberman wrote both the other parties that he was buying the 12,500 shares pursuant to an assignment from Vickers Christy. Consolidated's transfer agent authorized issuance of the 12,500 shares to Lieberman. Vickers' attorney rendered a hand-written opinion to Consolidated stating that Lieberman understood that the sale· of the shares was restricted and that the issuance of the shares to him was not a public offering requiring registration under the Securities Act of 1933. Finally, and most important, Vickers Christy and Vickers individually executed a release to Consolidated. This was the usual printed form of general release to which Consolidated's attorney had added in typewriting:

and more particularly referring to any obligations which Consolidated Research and Manufacturing Corporation may have to Vickers, Christy and Co., Inc., arising out of an underwriting agreement dated August 22nd, 1960, and also referring to any obligations which Consolidated Research and Manufacturing Corporation may have to the said Vickers, Christy and Co., Inc., for the issuance to Vickers, Christy and Co., Inc., of 12,500 shares of Consolidated Research and Manufacturing Corporation stock at $1.00 per share as noted on the cover sheet

of the Prospectus and also as noted in Part Two of the Prospectus in the paragraph which refers to "UNDERTAKINGS".

Although these maneuvers resulted in Vickers Christy preparing a revised balance sheet, dated as of February 10, 1961, which showed 7,155 Consolidated shares at a value of $18 per share, or $128,790,[4] they did not produce the desired result. Toward the end of March, 1961, the late Judge Dawson granted the SEC's motion for a preliminary injunction and appointed Theodore R. Kupferman as receiver of the assets of Vickers Christy. In October, 1961, after various unsuccessful demands on Consolidated to file a post-effective amendment with respect to 6,000 shares still held by him, the receiver, represented by I. Arnold Ross, as attorney, began this action against Consolidated, seeking damages for breach of its agreement to do so.

Meanwhile Consolidated's affairs had been rapidly deteriorating. The Bridgeport, Conn., law firm of Friedman & Friedman, which had acted as counsel for Consolidated in February, 1961, withdrew from representing the company during the spring or summer of that year. When the receiver's action was instituted, Consolidated was represented by Breed, Abbott & Morgan, of New York City. However, that firm withdrew after filing an answer, which advanced no claim of release, and was replaced by Francis J. Purcell, of Manning, Hollinger & Shea, also of New York City. By the time he entered the case, Consolidated was defunct; its president, Marvin Botwick, who had been in active charge of the stock issue, died shortly after Purcell was retained; and Purcell's main source of information

---

4. Five hundred of the 8,000 shares taken by Vickers Christy were immediately returned to Lieberman as collateral for Lieberman's $5,000 loan to Vickers Christy. The record sheds no light on why only 7,155 rather than 7,500 shares were shown on the February 10 balance sheet, or why Vickers failed to apply the 30%

discount its attorney had advised. Further details concerning Vickers Christy's dealings in the shares are contained in Judge Levet's 1962 opinion. Kupferman v. Consolidated Research & Mfg. Co., [1961–1964 Transfer Binder] CCH Fed. Sec.L.Rep. ¶ 91,197 (S.D.N.Y.1962).

was Salvatore Cuomo, then a Vice President and director, who apparently had little knowledge of the facts. The files Purcell received from Breed, Abbott & Morgan did not contain the February 10 release, and Purcell did not communicate with the Friedman firm, which had prepared it. Ross, on the other hand, was far more diligent; in April 1962, he obtained from the Friedman firm copies of all the papers exchanged at the February 10, 1961 closing. In the course of pre-trial proceedings in May, 1962, Purcell did obtain a copy of the February 10, 1961 Vickers Christy *letter* to Consolidated which we have quoted above. Construing this as merely a·consent by Vickers Christy that the shares be issued to Lieberman rather than itself, he made no inquiry whether there was any other instrument of release. Ross offered the letter, but not the release or the opinion letter, in evidence at the trial.

On December 19, 1962, Judge Levet rendered an opinion awarding the receiver damages against Consolidated of $136,500, with interest from May 26, 1961, for breach of its agreement to file a further post-effective amendment. The judge's typically careful findings of fact and conclusions of law made no reference to any claim of release; the defense, rejected by the court, was rather that Consolidated had so conducted itself that, had it filed the amendment, the SEC would not have permitted this to take effect, and therefore the failure to file was not the cause of any damages Vickers might have suffered.

It having proved impossible to collect the judgment from Consolidated, the receiver obtained an order from the district court, in April, 1964, appointing himself receiver of Consolidated also, with authority to bring all actions necessary to recover property of the judgment debtor. It was then that Purcell first learned

from the Friedman firm about the release. Inconclusive correspondence between Purcell and Ross ensued. Nearly three years later, Kupferman, in his capacity as receiver of Consolidated, brought an action in the Supreme Court of New York for New York County against appellant Daniel Jacobson and eight other persons who had been directors of Consolidated in 1961, including Albert J. Kleban, a partner in the Friedman firm. One cause of action asserted a conspiracy by the defendants to cause Consolidated not to file the post-effective amendment despite its agreement to do so. After long and unsuccessful efforts to persuade the receiver and his attorney to drop the claim because of the release and other reasons, and replacement of Mr. Kupferman (now a justice of the Appellate Division) as receiver by Sherman J. Saxl, Jacobson answered, pleading the release as a defense. The new receiver moved to strike the defense; the defendants cross-moved for summary judgment. The trial justice denied both motions in an opinion; both sides appealed. The first point in Ross' appellate brief as the receiver's attorney was

THE DISTRICT COURT GRANTED THE RECEIVER OF VICKERS THE JUDGMENT WITH KNOWLEDGE THAT VICKERS HAD EXECUTED A RELEASE TO CONSOLIDATED [5]

While the appeal was pending before the Appellate Division, Jacobson moved the District Court to vacate its judgment of 1962. Although in the course of the argument on the motion, Judge Levet confirmed that he had not been aware of the release in 1962, he denied the motion in a brief opinion on October 14, 1971, 53 F.R.D. 387, from which this appeal is taken. Five days later the Appellate Division modified the trial justice's order so as to strike the defense of

---

5. The text made clear that Ross' contention was that the district court had such knowledge from the February 10 *letter*.

While probably within the bounds of fair argument, this assertion has proved to be factually incorrect.

release.[6]  Efforts to secure review by the New York Court of Appeals at this stage have failed.

## II.

F.R.Civ.P. 60(b) authorizes a court on motion to "relieve a party or his legal representative from a final judgment" for "(1) mistake, inadvertence, surprise, or excusable neglect" or "(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." However, motions seeking relief under these broad provisions may not be made "more than one year after judgment was entered." Any rights of appellant to have the 1962 judgment vacated must therefore stem from the saving clause in Rule 60(b):

> This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment . . . or to set aside a judgment for fraud upon the court.

Since appellant has not initiated an independent action for fraud *inter partes*,[7] he can prevail only upon a showing that Ross practiced "fraud upon the court" by not disclosing the release.

The meaning of the quoted phrase has not been much elucidated by decisions. Obviously it cannot be read to embrace any conduct of an adverse party of which the court disapproves; to do so would render meaningless the one-year limitation on motions under F.R.Civ.P. 60(b) (3). See 7 Moore, Federal Practice ¶ 60.33 at 511 (1971 ed.). Professor Moore submits that the concept should "embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that

the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Id.* at 515 (footnote omitted). We accepted that formulation in Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798, 801 (2 Cir. 1960). Professor Moore explains Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), setting aside a judgment on motion because of conduct which, shocking as it was, was a shade less flagrant than that held insufficient to sustain a plenary action in United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93 (1878), see fn. 7, largely on the basis, claimed by appellant to be presented here, that an attorney was implicated in perpetrating the fraud. While an attorney "should represent his client with singular loyalty that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court." 7 Moore, *supra,* at 513 (footnote omitted).

## III.

If there were no facts other than those stated up to this point, it would be hard to resist the conclusion that the case came within the boundaries of the concept of "fraud upon the court" which this court recognized in *Martina Theatre, supra,* 278 F.2d at 801, strict as these are. Contrary to views intimated by the district court, Purcell's negligent failure to discover the release would not of itself operate against such a conclu-

---

6. Saxl v. Roberts, 37 A.D.2d 932, 325 N.Y.S.2d 993 (1st Dep't 1971). It goes without saying that Justice Kupferman did not take part in the decision.

7. It is questionable whether such an action for an "intrinsic" fraud such as that here alleged could have survived a motion to

dismiss so long as United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93 (1878) remains the federal law. The *Throckmorton* doctrine was strongly attacked by Judge Brennan, as he then was, in Shammas v. Shammas, 9 N.J. 321, 329–330, 88 A.2d 204, 208 (1952).

sion if Ross had instituted, or allowed a judgment to be recovered in, an action to which he knew there was a complete defense. Hazel-Atlas Glass Co. v. Hartford-Empire Co., *supra*, 322 U.S. at 246, 64 S.Ct. 997, 88 L.Ed. 1250. However, the full story has not yet been told; when it has been, Ross' conduct appears in a different light.

Very likely as a result of the scepticism with respect to the salability of the Consolidated shares which Judge Dawson exhibited when Vickers testified before him on February 22, 1961,[8] Vickers, on March 3, 1961, sent a telegram to Consolidated demanding that it file a post-effective amendment. On March 5 he confirmed this in a letter to Kleban, secretary of Consolidated and the partner in the Friedman firm who had prepared the release, stating:

As per Paragraph 1, Page 1 of Prospectus, we have exercised our right to purchase 12,500 shares of Consolidated Research and Manufacturing Corporation.

We desire to make a public distribution of these 12,500 shares, and, as attorney for Consolidated Research and Manufacturing Corporation, would you please immediately file a post-effective amendment and prospectus, as covered in our underwriting agreement.

If Kleban thought the release meant what on its face it seems to mean, one would have supposed the telegram and letter would have elicited an immediate answer that Vickers Christy was now seeking what it had expressly foregone

only three weeks before. The record reveals no such response. The next pertinent document is a letter, dated August 8, 1961, from Arthur B. Friedman informing Consolidated of Ross' intention to bring suit for breach of the agreement to file a post-effective amendment and stating:

I again strongly urge the corporation to make every effort to submit its financial statement and proceed immediately to file the post-effective Amendment. Failure to do so forthwith will undoubtedly open the door to litigation with consequent damages should the corporation be found liable for the alleged losses.

A copy of this letter was sent to Ross, who at that time knew nothing of the release. There is thus no possible ground for criticizing Ross' action in *bringing* the action in October, 1961; rather it was his duty to do so.

We turn then to Ross' conduct after he received a copy of the release in April, 1962. In his affidavit opposing the instant motion he averred that, pursuant to court order, he had been examining Vickers under oath from time to time in an endeavor to obtain evidence that would assist the receiver in carrying out his duties. On May 10, 1962, Ross interrogated Vickers about the release. Vickers answered that the release, prepared by Friedman & Friedman, had been signed at the closing in Consolidated's office in Connecticut; that its purpose was simply to show "that Vickers, Christy & Co., Inc., had actually received the 12,500 shares"; and that Mr. Friedman "had given that

---

8. Although appellant finds great significance in Vickers' testimony and affidavits before Judge Dawson, we do not believe these aid him to any material extent. Vickers testified that his firm had offers to buy the Consolidated shares in their unregistered form (presumably in a private placement), without any significant discount from their current OTC price. Vickers was clearly attempting to persuade Judge Dawson that the Consolidated shares, unregistered as they then were, were still marketable. While that testimony would tend against an argument that Vickers Christy never would have released Consolidated from its post-effective amendment obligation because the firm would have been left with unmarketable shares, we see nothing in it which would have put the receiver on notice that Vickers Christy had foregone its right to have the Consolidated shares registered at some future date.

as the reason for asking him to sign it." While it is hard to square this explanation with the generality of the first typewritten clause of the release, particularly when that is read in light of the letter of February 3, Ross was not aware of the latter, see note 3, *supra* and Vickers' construction gained credence from Consolidated's failure promptly to reject his demands of early March and from Friedman's letter of August 8. Ross cannot therefore be criticized for *continuing* to prosecute the litigation after learning of the release; he could have expected that his adversary would also be armed with such knowledge and that the court would have to determine whether the release meant what it said or only what Vickers alleged he had been told.

The crucial question thus becomes whether it was fraud upon the court for Ross to fail to disclose the release when, as the trial came to an end, Purcell had said nothing about it, but instead based the defense on his own expert testimony that the SEC would have refused to allow an amendment to become effective since Consolidated had not used the proceeds of the securities sale for the purposes stated in the prospectus.

If this had been a criminal case, such non-disclosure by a prosecutor of a piece of evidence that might have been so material to the defense would almost certainly have afforded ground for collateral attack. See United States v. Keogh, 391 F.2d 138, 147–148 (2 Cir. 1968). But it was not. Neither was this a case where Ross and his client stood in a fiduciary relation to Consolidated or were under any order to produce all relevant documents. *Cf.* Alleghany Corp. v. Kirby, 333 F.2d 327, 341–343 (2 Cir. 1964) (dissenting opinion), aff'd by an equally divided court, 340 F.2d 311 (2 Cir. 1965), cert. granted, 381 U.S. 933, 85 S. Ct. 1772, 14 L.Ed.2d 698, dismissed as improvidently granted, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966). Although Judge Frank said in Phelan v.

Middle States Oil Corp., 154 F.2d 978, 991–992 (2 Cir. 1946), that a receiver "is a trustee with the highest kind of fiduciary obligations," the next sentence of the opinion makes clear that these obligations are those that run "to all persons interested in the receivership estate," and the many illustrations given relate to failure to discharge such duties, the issue there before the court, not to proceedings against adversaries. The duty of a receiver's attorney, when seeking to recover monies for the estate, like that of all other attorneys, is the high one of "integrity and honest dealing with the court," 7 Moore, *supra*, at 513, not something vaguely higher.

■ Whether Ross' failure to apprise the court of the release before the trial ended was such a breach of that duty as to constitute a fraud upon the court is not altogether easy to decide. Doubtless the highest standards of professional conduct would have suggested that he should have sought counsel from the judge or—perhaps better—from Judge Dawson, concerning where his duty lay. However, it is all too easy to fall into the error of condemning conduct with the aid afforded by the bright glare of hindsight—specifically our knowledge of Purcell's ignorance of the release and of the contents of the February 3 letter. Ross had to make his decision without benefit of such knowledge. He could hardly have supposed that so experienced a lawyer as Purcell would have failed to contact the attorneys who had represented Consolidated when the sale of the 12,500 shares was consummated and obtain the papers Ross had secured for the asking. He could have thought not unreasonably, particularly in light of Friedman's letter of August 8, that such inquiry had been made but had resulted in Friedman's confirming the construction of the release to which Vickers had testified, and that therefore Purcell had made a tactical decision to defend on another ground. Broad statements that a trial is a search for the truth must be

read in the context that, under our legal system, the method for reaching this goal is a properly conducted adversary proceeding. The vague requirement of "candor and fairness" in the Canons of Professional Ethics in force in 1962 could hardly be read as requiring Ross to make certain that his opponent was fully aware of every possible defense that could be advanced. The present Code of Professional Responsibility does not advance matters greatly when it tells us that a lawyer shall not "[c]onceal or knowingly fail to disclose that which he is required by law to reveal," DR 7–102(A) (3) (1970). So far as we can see, Ross made no misrepresentations; [9] it would be going too far to characterize as "fraud upon the court" his failure to disclose an instrument which he could have supposed reasonably—although, as it now appears, erroneously—to have been known to his adversary.

### IV.

■ Appellant urges that if we should decline to reverse the order denying the motion to vacate the judgment, we should direct the district court to instruct its receiver not to pursue the action in the New York courts since it would shock the conscience if he were to be allowed to recover against Jacobson and other directors for causing Consolidated to breach a duty it no longer had. Apart from other considerations, this would involve our determining that the release has the broad meaning asserted by appellant but controverted by the receiver, without the latter's having had a full day in a trial court. Except for the *per curiam* opinion of the Appellate Division, we should have been inclined to suppose, as did the State trial justice, that this issue remained open for litigation in the state action. We are not aware of the extent to which the defendants in the pending New York State litigation were able to control the conduct of the federal litigation, but it appears that such control was minimal. While the federal judgment is indeed conclusive as to the breach of agreement upon Consolidated and persons deriving their title from it (for example, persons alleged to have received conveyances in fraud of creditors), we would not be willing to say, without more extensive briefing than has here been furnished, that the doctrine of "privity" would extend the conclusive effect of the judgment to a tort claim against the directors for causing Consolidated to fail to fulfill an agreement if in fact there was no longer an obligation to do so. Nor could we decide, without further briefing, the extent to which this issue is affected by the fact that, while the federal judgment was entered in favor of Kupferman in his capacity as receiver of Vickers Christy, the state court action is now being pursued in his successor's capacity as receiver of Consolidated. *Cf.* Restatement of Judgments § 80(3) (1942). Such issues are for the New York courts to determine, at least initially. *Cf.* Zdanok v. Glidden Co., 327 F.2d 944, 956 (2 Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). However, we should not wish them to proceed on the basis that this court would necessarily consider that allowing the directors to litigate the effect of the release, with the added light afforded by the February 3 letter, would constitute an unwarranted collateral attack on a federal judgment.

■ The order denying the motion to vacate the judgment is affirmed. Ross' request for double costs and damages, 28 U.S.C. § 1912, is wholly unjustified and is denied.

---

9. Appellant contends that Ross' proposed findings of fact and conclusions of law which he submitted at the end of the trial were affirmative misrepresentations to the court since they omitted any reference to the release. Since Ross could not properly have included in his proposed findings something that had not been put in evidence, this argument is simply another way of stating appellant's contention that Ross was bound to inform Purcell about the release.