**UNITED STATES of America, Plaintiff,**

v.

**John DEMJANJUK, Defendant.**

No. C77–923.

United States District Court,
N.D. Ohio, E.D.

Nov. 28, 1983.*

* This opinion, previously published at 101 F.R.D. 680, is republished to reflect corrections made . in the appearances of counsel.

Mark J. O'Connor, Buffalo, N.Y., John J. Gill, Cleveland, Ohio, for defendant.

Michael Wolf, Bruce J. Einhorn, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

This action was originally filed under the Immigration and Nationality Act of 1952, 8 U.S.C. § 1451(a), to revoke the Certificate of Naturalization of the petitioner, John Demjanjuk, also known as Iwan Demjanjuk, and to vacate the order admitting him to United States citizenship. The petitioner was admitted to the United States for lawful permanent residence on February 9, 1952, pursuant to the Displaced Persons Act of 1948, ch. 647, 62 Stat. 1009, as amended by the Act of 1950, 64 Stat. 219. On November 14, 1958, the petitioner became a United States citizen by order of the United States District Court for the Northern District of Ohio, Eastern Division.

The Government's complaint alleged that the petitioner had served with German SS (Schutzstaffel) personnel during World War II. In particular, the Government alleged that, between 1942 and 1943, the petitioner served with the German SS at three locations: (1) at the SS training camp at Trawniki, Poland; (2) at the extermination camp at Treblinka, Poland; and (3) at the extermination camp at Sobibor, Poland. The Government further alleged that, between 1944 and 1945, the petitioner had served in a German military unit composed of Ukrainians.

During a five-week long trial, both parties presented evidence in the form of live eyewitness testimony, videotaped and written depositions, expert witness testimony, and documentary evidence. After a thorough review of the trial transcripts and the exhibits admitted as part of the evidence presented at trial, this Court held that, where the defendant had failed to disclose his service with the German SS and had willfully misrepresented that service on his visa application, the defendant's failure to disclose was a material misrepresentation. Further, this Court held that, pursuant to Section 1451(a) of the Immigration and Nationality Act, his citizenship was also illegally procured and would be revoked. Judgment was entered on June 23, 1981. The judgment that the petitioner asks this Court to vacate was twice-affirmed in the Sixth Circuit and the United States Supreme Court. *United States v. Demjanjuk*, 518 F.Supp. 1362 (N.D.Ohio 1981), *aff'd* 680 F.2d 32 (6th Cir.1982), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982).

Currently before the Court is the petitioner's motion to vacate the aforementioned judgment. The petitioner's motion was filed on October 26, 1983. The Government has filed a memorandum in opposition to the petitioner's motion to vacate, and the petitioner has filed a reply.

## I.

In its decision to deny petitioner's motion to vacate, the Court has reviewed both

parties' memoranda of law, as well as the petitioner's supporting affidavits. The Court took particular care in reviewing recently drafted affidavits of two former Government witnesses for material inconsistencies between their original deposition testimony and statements they made in these most recent affidavits. In so doing, the original trial transcripts were re-examined, including the deposition testimony of these two witnesses.

In the instant action, petitioner moves on several grounds for an order vacating the judgment made and entered by this Court on June 23, 1981:

1. Fraud, misrepresentation and misconduct on the part of material witnesses and the plaintiff under Rule 60(b)(6).

2. Fraud on the Court under Rule 60(b)(6).

3. Neglect on the part of the attorney for the Defendant in the action under Rule 60(b)(6).

4. Misconduct errors and corruption of the court under Rule 60(b)(6).

*See* petitioner's motion, page 1.

■■■ Federal Rule of Civil Procedure 60(b) provides for equitable relief from a judgment or order in certain prescribed circumstances.[1] Under Rule 60(b), except for instances wherein fraud has been perpetrated upon the court, the court considering a motion to vacate may not review the motion for mistake, neglect, misrepresenta-

tions or misconduct of an adverse party unless the motion is made within one year after final judgment has been entered. As petitioner's motion was made well over a year after the Court's June 23, 1981 judgment was entered, his motion on the first and third grounds is untimely. However, under Rule 60(b), for any ground other than mistake, newly discovered evidence or intrinsic or extrinsic fraud, a motion to vacate need only be filed "within a reasonable time." In the instant case, a court may consider such a motion based on petitioner's fourth ground within a reasonable time after final judgment has been entered. A court may always consider a motion to vacate in the event of fraud upon the court. The only time limitations for actions to vacate a judgment for fraud upon the court are those of laches or statutes of limitations. Those time limitations do not apply to the instant case. The Court makes its determination of the merits of petitioner's motion after consideration of grounds two and four.

### A.

The court in *Honneus v. Donovan*, 93 F.R.D. 433 (D.Mass.1982), *aff'd* 691 F.2d 1 (1st Cir.1982), shed some light on what constitutes a fraud upon the court under Rule 60(b). The court had entered a default judgment against defendant Donovan after he had repeatedly failed to defend

---

1. Federal Rule of Civil Procedure 60(b) reads as follows:

MISTAKES; INADVERTENCE; EXCUSABLE NEGLECT; NEWLY DISCOVERED EVIDENCE; FRAUD, ETC. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28 U.S.C. § 1655, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

himself against the plaintiff's charges. One day short of a year after the court had entered the default judgment against him, defendant Donovan moved for relief from the judgment. In support of his motion, Donovan asserted that plaintiff Honneus had perpetrated a fraud upon the court by claiming that he was a resident of Florida, rather than Massachusetts, to avail himself of diversity jurisdiction. *Id.* at 434–35.

The *Honneus* court determined that its inherent power under Rule 60(b) to vacate a judgment procured by fraud upon the court did not authorize it to vacate the judgment entered against Donovan. As the court explained, fraud upon the court usually involves " 'the most egregious conduct involving a corruption of the judicial process itself.' " *Id.* at 436, quoting *Lockwood v. Bowles*, 46 F.R.D. 625, 632 (D.D.C. 1969). The court found no fraudulent conduct on plaintiff's part. The court did not believe that the plaintiff knew his statement regarding his state of residence was false or that he had ever intended to deceive the parties or the court. *Id.*

The court in *Kupferman v. Consolidated Research and Manufacturing Corporation*, 459 F.2d 1072, 1078 (2d Cir.1972), observed that courts have not met with much success in their attempts to elucidate on the phrase "fraud upon the court." The court was definitive, however, in its observation that the phrase "cannot be read to embrace any conduct of an adverse party of which the court disapproves" since "to do so would render meaningless the one year limitation on motions under F.R.Civ.P. 60(b)(3)." *Id.* The *Kupferman* court relied on Professor Moore's assertion that fraud upon the court should "embrace only that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudicating cases that are presented for adjudication." *See* 7 Moore's Federal Practice ¶ 60.33 at 515 (1971 ed.)

The court in *Toscano v. Commissioner of International Revenue*, 441 F.2d 930 (9th Cir.1971), also considered Professor Moore's definition in evaluating the merits of a motion to vacate a tax court decision. The court maintained that the phrase "fraud upon the court" ought to be read narrowly, in the interest of preserving the finality of judgments. *Id.* at 934. Accordingly, the court reaffirmed earlier Ninth Circuit strictures on determinations of fraud upon the court, including one that "the acts of the adverse party must be such as prevented the losing party from fully and fairly presenting his case or defense." *Id.* (citations omitted). The court added that "it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision." *Id.* (citations omitted).

In the instant case, the petitioner bases his motion to vacate on the affidavits of Otto Horn, Heinrich Schaefer and Mark O'Connor. Horn and Schaefer's affidavits are dated September 13, 1983. O'Connor's affidavit bears an October 26, 1983 date. O'Connor represents the petitioner in this matter. By way of his affidavit, O'Connor alleges that the Office of Special Investigations, the Criminal Division of the United States Department of Justice (the "OSI"), as an officer of the court, has perpetrated a fraud upon the Court by presenting the Court with what it knew to be perjured testimony. In his affidavit, O'Connor alleges that the trial testimony of both Horn and Schaefer contained perjured statements and that this Court relied heavily on the testimony of these two individuals in making its final determination. In support of his allegations of perjury, the petitioner submits new affidavits from Horn and Schaefer. The petitioner suggests that, when compared to those witnesses' depositions, which were read into the original trial transcript, these most recent affidavits reveal that the two government witnesses perjured themselves on material portions of their trial statements.

The petitioner also asserts, by way of O'Connor's affidavit, that the Soviet government seeks to discredit the petitioner, a Russian expatriot, and to that end,

that the Soviet government falsified the Trawniki SS Training Camp identification card which was admitted as evidence of the petitioner's cooperation with the Nazis during World War II. The petitioner adds that the OSI collaborated with the Soviet government to conceal from this court the perjury of witnesses Horn and Schaefer and the true history of the Trawniki identification card. Beyond submitting for consideration a copy of *United States v. Kungys,* 571 F.Supp. 1104 (D.N.J.1983),[2] the petitioner offers no proof of actions on the part of the Soviet government to precipitate the petitioner's denaturalization and the deportation trial now pending. Nor does the petitioner offer any proof of the OSI-Soviet collaboration the petitioner contends this Court condoned and actively endorsed.

■ Without more substantial, better documented evidence that the OSI and the Soviet government did conspire to deceive this Court as to the trustworthiness of the evidence amassed against the petitioner, or that the Court was an active participant in an OSI-Soviet plot to strip petitioner of his citizenship, this Court sees no reason to retry the evidentiary questions raised and scrupulously considered at trial regarding the admissibility of, and the weight to be

accorded to, various witnesses' testimony or the Trawniki Camp identification card formerly in the custody of the Soviet government. None of the bald assertions contained in O'Connor's affidavit regarding any fraud upon the court as perpetrated by the OSI and the Soviet government move this Court to vacate judgment in the case. *See* O'Connor affidavit, paragraphs 21–27.

B.

■ According to the court in *Lockwood v. Bowles, supra,* 46 F.R.D. at 632, "[p]erjury does not constitute 'fraud upon the court.'" Without evidence of a concerted conspiracy to deceive the Court, the only fraud the petitioner's motion and supporting documents even suggest is the perjury of witnesses Horn and Schaefer. The petitioner maintains that he was unable to discover that these witnesses perjured themselves until they were recently contacted, presumably by O'Connor, petitioner's counsel, and agreed to make new affidavits. The only information the petitioner provides to substantiate his inability to secure evidence of perjury on the part of the two witnesses is O'Connor's own unsubstantiated affidavit statement that Schaefer told him that he had been reluctant "to give interviews to individuals investigating the

**2.** The scenario with which Judge Debevoise was confronted in *United States v. Kungys, supra,* differed markedly from the one confronting this Court. According to Judge Debevoise's opinion, not only did the Soviet government provide documents that were admitted against the defendant in his denaturalization trial, but they also assembled and interrogated the witnesses that the United States subsequently presented as government witnesses. *Id.* at 1123. The *Kungys* court also noted that the defendant presented evidence at trial of Soviet attempts to discredit former Lithuanian nationals, like Kungys, who had spoken out against Soviet control, by characterizing such individuals as war criminals. *Id.* at 1124. The Court heard evidence of sophisticated Soviet-backed campaigns against political dissidents for which Soviet judges and procurators are instructed by their government to prosecute denaturalized individuals once they are deported and extradited to the USSR. Evidence was presented that, in effecting these campaigns, the Soviets make concerted efforts to publicize claims that foreign nations are harboring Nazi war criminals. *Id.* at 1125. Final-

ly, the *Kungys* court was particularly concerned with the manner in which depositions were taken. The court felt that the fact that Soviet representatives actually participated in the prosecution team, that the depositions were taken behind the Iron Curtain and that, prior to being deposed, all citizens of countries under communist control, received "reminders" by the Soviet procurator of their obligations under Soviet law, raised serious questions as to the reliability of the witnesses' testimony. *Id.* at 1127.

In the instant case, defense counsel made no real attempt to present evidence of Soviet influence over witnesses or over the Government's investigation and prosecution teams. The Court is not inclined to take judicial notice of such serious charges as propagandizing, witness harassment and tampering with evidence without reliable evidence that such events took place in the preparation and presentation of petitioner's trial. Defense counsel ought to have raised the issue at an earlier point in the case if he believed he did not have an opportunity to fully investigate the possibility of Soviet influence.

**6**

Demjanjuk case because of his fears for the lives of his close family members who are still being held captive by the Russians." *See* O'Connor affidavit, paragraphs 9 and 11. O'Connor, further alleged as affiant that Schaefer had expressed these fears to an OSI agent and that it was after months of deliberation that Schaefer decided that he had an obligation to provide the information included in his September 13, 1983 affidavit. *See* O'Connor affidavit, paragraph 10. None of these statements, as O'Connor recounts them, are included in Schaefer's latest affidavit. In addition, Horn testified on defense counsel's cross-examination at Horn's deposition that he was divorced over thirty years ago and had no family in Berlin. (Tr. 349–50) Notably, defense counsel neglected to ask Horn whether he had any fears of retaliation from Russian or OSI officials if his testimony did not comport with their needs. The petitioner offers no explanation for his failure to discover the alleged perjury of Otto Horn. Without additional and better substantiated evidence that, due to the efforts of officers of the court to deceive this Court, Horn's and Schaefer's purported perjury was not obtainable within the one-year limitation of Rule 60(b), the Court must conclude that the most recent affidavits submitted are not dispositive evidence of fraud upon the court.

### C.

■ Since the affidavits submitted only constitute possible evidence of intrinsic or extrinsic fraud, this Court may not review the petitioner's motion to vacate, filed two years after final judgment had been entered. However, were the Court at liberty under Rule 60(b) to review for perjury the most recent Horn and Schaefer affidavits, it would conclude that neither these affida-

vits, nor that of O'Connor, present any new information or any information that differs materially from trial testimony considered by this Court. The Court finds that the difference between testimony at trial and these new affidavits is *de minimus* at best. Consequently, there is no reason to retry the issue of denaturalization on the basis of these affidavits.

Government witness Otto Horn was deposed in 1980 in preparation for the denaturalization trial over which this Court presided. That deposition was read into the trial transcript by way of a videotape recording. Horn was a German guard at Treblinka who had been tried and exonerated for his activities at the death camp. (Tr. 330). Horn testified that, prior to his 1980 deposition, he was shown two photospreads from which he identified "Iwan," the Ukranian guard. (Tr. 315–17). During the deposition, Government counsel showed Horn one of the photospreads he had been shown previously in his home. Horn picked out the man he thought was "Iwan" from both spreads.[3] His deposition testimony is completely consistent with Horn's remarks in his most recent affidavit.[4] Horn testified at his deposition that he was assigned to work in the upper camp at Treblinka near the gas chambers. (Tr. 297). Horn also testified that he recalled having seen the Ukrainian he identified as Iwan in the anteroom of the gas chambers. (Tr. 325). When asked what he saw Iwan do near the motors of the gas chamber, Horn responded "[n]o I didn't see. I didn't go in there. I only saw him going in.... Into the gas chamber." (Tr. 328). Later in the deposition, Horn denied ever having been present when the engines that pumped gas into the chambers were turned on. (Tr. 355). Horn admitted that he had never seen the man

---

3. A: That's the one.
Q: Which photograph is this, Mr. Horn?
A: That is this Iwan probably.
(Tr. 319, 321–22).

4. 3. Prior to the taking of my deposition in 1980, I had been asked on two (2) previous occasions by attorneys representing the United States Government if I could identify a Ukrain-

ian who was at that time being tried in the United States.

4. Eight (8) photographs were shown to me by the United States Government Attorney and I told him that one of the pictures resembled the Ukrainian at Treblinka that I had seen in the company of a German by the name of Schmitt....

he knew as Iwan actually commit any atrocities. (Tr. 398).

Horn's deposition testimony regarding the extermination-related activities he witnessed at Treblinka is consistent with remarks he made in his most recent affidavit. In that affidavit, Horn remarked that he had never witnessed any exterminations while a guard at the camp, although, from approximately fifty (50) meters away, he saw people walk into the building where exterminations took place. *See* Horn affidavit, paragraph 5 and 6. In his deposition testimony, Horn volunteered only that the Ukranian guard he knew as Iwan was "tall and mighty." (Tr. 307). When questioned further, he added that the guard's build was "staunch and corpulent." (Tr. 307). The remainder of Horn's rather general description indicated that the Ukranian guard had a light to normal complexion and rather long dark hair. (Tr. 307). Horn's admission in his most recent affidavit that he selected a picture from the photographic array Government representatives showed him based on his recollection that the Ukrainian guard was tall and broad, not on any recollection of the guard's facial features, and that all he remembered about the guard's appearance was his stature and build, suggest that he placed special emphasis on the size of the Ukrainian guard he attempted to identify. The rather general description of the guard he gave during his deposition is not inconsistent with the gist of the remarks included in the affidavit.

Heinrich Schaefer was a Russian soldier who was captured by the Germans in Poland and taken to Trawniki in August of 1941. (Tr. 185–188). Schaefer worked as a paymaster in the Trawniki camp's administrative office. (Tr. 194). Schaefer's trial testimony corroborated that of an expert witness for the Government as to the authenticity of the Trawniki identification card bearing the petitioner's likeness. (Tr. 178 et seq.) The statements in Schaefer's most recent affidavit bear on the authenticity of the Trawniki training camp identification card, the front and back of which were Government's Exhibits 5 and 6 at trial. Statements included in Schaefer's most recent affidavit do not contradict his trial testimony, but supplement it.[5] At trial, Schaefer's testimony bore on the authenticity of the signatures of certain SS officers with whom he had worked that appeared on Exhibits 5 and 6. (Tr. 209–216). Schaefer also testified regarding general administrative procedures at the training camp. (Tr. 221–223; 230–39). None of the questions directed to Schaefer, by Government or defense counsel, were formulated to elicit such information as Schaefer included in paragraphs 4, 5, 6, 7 and 8 of his latest affidavit. Notably, however, just as he did

5. Pertinent portions of Schaefer's affidavit include the following:

4. In the years of my continuous duty in the Trawniki camp, between 1941 and 1944, there never was issued an identification paper to a guard, which at the same time contained a list of objects which were received by him. The list of equipment was a special document, which was kept at the camp administration where I worked.

5. The list of equipment for guards always contained the carbine which was issued to the guard and its number. The ammunition for this weapon was handed out where the guard was appointed. It is completely unimaginable that there was no carbine given to a guard, as that was, to a certain extent, his right arm, without which he could not perform his duty.

6. The copy of the identification card, which was shown to me by the representative of the U.S. Government contains, in addition to the list of equipment, also a reference to an official transfer to an agricultural estate in Okzow, as also to Sobibor. This document cannot have been issued in Trawniki.

7. Official transfers were never recorded on identification documents. Such information was kept in the records of the respective competent place of command. Also, the date of issuance had to be on every identification card, otherwise such a paper was automatically invalid.

8. Every guard in Trawniki, including myself, had an identification paper on which his name appeared only once. A card such as the one which was shown to me and which shows the name Iwan Demjanjuk twice, was never issued by me. I know of no such cards.

9. During my previous questioning before the U.S. Consul I was never asked my opinion about the authenticity of the "Demjanjuk card". I did declare, that I never saw a card like that one during my service in Trawniki and assumed that the affidavit was sufficient.

expressly in paragraphs 9 and 8 of the affidavit in support of this motion, at trial, Schaefer qualified any testimony he gave by admitting that he had never seen a card similar to Government's Exhibits 5 and 6, the Trawniki Training Camp card. (Tr. 229–39; 197–98).

In sum, although some of the information included in Schaefer's most recent affidavit may be new or presented in a new way, none of it actually contradicts his trial testimony. Further, a review of the trial transcript strongly suggests that defense counsel could have shaped his cross-examination of this witness to elicit responses similar to statements in Schaefer's affidavit. The petitioner, by way of O'Connor's affidavit, contends that the delay in securing the information in Schaefer's most recent affidavit was due to Schaefer's fear of retaliation by the Russian authorities. However, Schaefer himself includes no such explanation in his affidavit. Finally, since Schaefer's testimony was presented to corroborate the testimony of an expert witness and several eyewitnesses, it was cumulative. Although his testimony was probative, the Court did discount it somewhat, in light of Schaefer's limited familiarity with signatures appearing on Government Exhibits 5 and 6 and his reluctance to unequivocably identify the exhibits as copies of an actual Trawniki camp identification card. Knowledge of the information contained in this most recent affidavit would not have affected the Court's decision in the petitioner's denaturalization trial.

## II.

■ Although the Court recognizes the deep-rooted policy in favor of the finality of judgments, the Court is also fully aware of the potential import of its denaturalization decision. The Court is particularly concerned with the impact of its decision on the lives of John Demjanjuk and his family. Consequently, in spite of the paucity of new evidence of any substance warranting scrutiny, and the unjustified delay in filing this motion under consideration, the Court

has seen fit to elucidate its reasons for denying petitioner's motion to vacate judgment in favor of a new trial. Hopefully, the Court's review of the information proffered by the petitioner will lay to rest any and all speculation that petitioner's case was not fully and fairly litigated. Determinations on motions for relief from judgment are within the sound discretion of the Court. Such determinations will not be disturbed on appeal unless the reviewing court has abused its discretion. *Marshall v. Monroe & Sons, Inc.*, 615 F.2d 1156, 1160 (6th Cir.1980).

In addition to submitting a motion to vacate judgment, the petitioner also requested that this Court, pending resolution of the motion to vacate, issue an order to stay a deportation proceeding before Administrative Law Judge Angellili in which the petitioner is the defendant. *See* O'Connor affidavit, paragraph 14. As said deportation proceeding has since been continued until some time in December of 1983, the Court declines to rule on petitioner's request.

Motion to vacate denied.

IT IS SO ORDERED.