**In re the Marriage of Mary Elizabeth MARANDA, Petitioner, Appellant,**

v.

**Edward Charles MARANDA, Respondent,**

**TCF Banking and Savings, F.A., Garnishee.**

**No. C3–88–1306.**

Supreme Court of Minnesota.

Dec. 22, 1989.

Rehearing Denied Jan. 30, 1990.

James P. Michels, Best & Flanagan, Minneapolis, Theodore L. Collins, Collins, Buckley, Sauntry & Haugh, St. Paul, for appellant.

Shirley A. Reider, and Robert H. Zalk, Fredrickson & Byron, Minneapolis, for respondent.

YETKA, Justice.

This action arose on September 23, 1985, when Mary Maranda moved the court for an order, pursuant to Minn.R.Civ.P. 60.-02(3), (6), to reopen a judgment and decree that vacated the property settlement provisions of a decree of dissolution dated August 23, 1979, which had dissolved the marriage of Mary and Edward Maranda and had incorporated a written stipulation of the parties dividing their assets. Mary claimed that Edward had committed fraud on the court in his failure to disclose all of the assets of the parties and intentionally misleading the court as to the value of the assets that were disclosed. The trial

court awarded the relief Mary sought and ordered judgment on her behalf for Five Hundred Seventy-nine Thousand and No/100 Dollars ($579,000.00) and attorney fees and costs.

The court of appeals reversed the trial court, holding that there was insufficient evidence of fraud on the court. 435 N.W.2d 621. It further concluded that the method of valuation used by the trial court was too speculative. We reverse the court of appeals and affirm in part and reverse in part the original decision of the trial court.

The facts are very lengthy, but we feel compelled to outline them sufficiently to explain our decision in this case. Respondent, Mary Maranda, and appellant, Edward Maranda, were married on April 1, 1967, when Mary was 19 and Edward was 23. The parties are the parents of two children: John, born October 5, 1967; and Rosemary, born July 19, 1974. Edward obtained a university degree in business in 1967. Mary is a high school graduate who took some English and psychology classes at Anoka–Ramsey Junior College, but discontinued her formal education after the couple was married.

Shortly after the marriage, Edward was employed by Prudential Insurance Company. Beginning in 1974, Edward formed his own insurance agency. Throughout the course of the marriage, Edward received additional education in income tax preparation and prepared the parties' tax returns as well as tax returns of others. During the course of the marriage, Edward handled all the family's financial transactions, except for purchases of clothing and food, and kept all their financial records at his business office. During the years the parties were married, Mary never saw a completed tax return and occasionally signed blank real estate and tax documents presented to her by Edward. When Mary attempted to learn more about the family finances, Edward discouraged her involvement by becoming angry or explaining things in what Mary characterized as a confusing way.

The parties were separated in late June 1978. Between the date of the separation and the entry of the judgment and decree in August of 1979, Mary earned a gross income of approximately Seventy-five and No/100 Dollars ($75.00) per week by providing day care services in her home. During the separation period, the couple maintained a joint checking account into which Edward deposited between $800 to $900 per month to cover family expenses, including a mortgage payment on the homestead of Three Hundred and No/100 Dollars ($300.00) per month. Sometime around August 1978, Mary and a friend went to Edward's insurance agency while Edward was away and attempted to gather information about the Maranda family's finances without Edward's knowledge. This was discovered by Edward, who then became very angry.

Sometime before the stipulation was executed in July 1979, Mary contacted an attorney to represent her in the dissolution proceeding. Mary paid the attorney Three Hundred and No/100 Dollars ($300.00) and Edward paid him Seven Hundred Fifty and No/100 Dollars ($750.00), the remainder of the fee for handling the dissolution. Mary's attorney received all his information regarding the value of the marital estate from Edward. With respect to the financial information provided to Mary's attorney, Edward told Mary that, because the couple's children were involved, he would be fair in dividing up the marital property. Mary had no money for pretrial discovery beyond the initial Three Hundred and No/100 Dollars ($300.00) she gave to her attorney.

Mary maintains that her attorney did not obtain an appraisal of the homestead or the Maranda insurance agency, copies of recent tax records, banking or stock brokerage records, real property records, or a verified statement from Edward as to the nature and value of marital property. After drafting the stipulation, her attorney spent approximately 15 minutes discussing it with Mary.

The 1979 judgment and decree, which was based on the stipulation drafted by Mary's attorney, listed the parties' total assets as follows:

| | |
|---|---:|
| Savings | $ 2,000.00 |
| Shares of stock | 4,000.00 |
| Value of insurance business | 20,000.00 |
| Homestead equity | 40,000.00 |
| Interest in two partnerships relating to apartment buildings in which [Edward] owns one-fourth interest | 30,000.00 |
| Other unimproved land located in Pine, Carlton and Kanabec Counties | 4,000.00 |
| | $100,000.00 |

The judgment and decree also stated that the parties' total liabilities were Fifty-five Thousand and No/100 Dollars ($55,000.00), resulting in a net worth of Forty-five Thousand and No/100 Dollars ($45,000.00). The judgment and decree provided that Mary was to receive the homestead, Five Hundred and No/100 Dollars ($500.00) per month for 3 years as part of the property settlement and child support of Two Hundred and No/100 Dollars ($200.00) per month per child until the children reached age 18.

Mary first began to question the accuracy of the property settlement when she received telephone calls in the fall of 1984 from people who had earlier purchased real property on contracts for deed from Edward and Mary not listed in the stipulation or judgment and wanted Mary to execute quit claim deeds. In December of 1986, Mary received a phone call from a title company with respect to a parcel of real property located at 1901 Maryland Avenue in St. Paul. The title company wanted Mary to come to a real estate closing because some contract for deed vendees wanted to pay off their contract for deed and needed Mary's signature. The title company provided Mary with a quit claim deed dated January 5, 1979, (7 months before the dissolution) ostensibly conveying the Maryland Avenue property to Edward's father. Mary testified that she did not sign the quit claim deed, that the signature on the quit claim deed was not hers, and that she believed that it was a forgery. A handwriting expert testifying on behalf of Mary opined that the signature on the quit claim deed was not Mary's. Edward denied forging Mary's signature on the deed, but admitted that he was not sure where or when Mary signed the deed.

At the evidentiary hearings on Mary's motions before the referee and the trial judge, lengthy and detailed testimony was given by Mary, Edward, two experts testifying on behalf of Mary, and others concerning the character and value of property owned by Mary and Edward at the time of the judgment and decree. The bulk of the evidence were financial statements provided by Edward to banks between 1977 and 1985 and federal income tax returns from 1981 to 1985. During this period, Edward made the following representations regarding his net worth to various banks:

| | |
|---|---:|
| 6/10/77 | $166,000 |
| 3/21/78 | 243,600 |
| 6/28/78 | 167,000 |
| 9/ 1/80 | 464,000 |
| 9/22/81 | 691,000 |
| 9/14/83 | 803,375 |
| 5/ /86 | 762,000 |

By contrast, the July 1979 stipulation showed Edward's net worth at Forty-five Thousand and No/100 Dollars ($45,000.00). In addition, Edward alleged in his answers to Mary's interrogatories that his tax returns for 1979 and 1980 were unavailable and that he did not have a personal copy.

In summary, each of the financial statements listed substantially higher values for the marital property than were set forth in the judgment and decree. Both of Mary's experts attempted to estimate the 1979 value of the marital estate by analyzing these financial statements and tax returns and then projecting backwards or "interpolating" to reach a conclusion as to what the 1979 value of the marital estate was. Edward admitted that he misrepresented or "embellished" the value of his property when applying for loans, but maintained that the values listed in the judgment and decree were accurate at the time.

The record reflects that, at various times, Edward represented to banks that nearly every asset listed in the judgment and decree had a significantly higher value than that listed in the judgment and decree. In addition, there is evidence that, in 1979, Edward owned valuable property not listed in the judgment and decree. The following

is a summary of the evidence regarding the value of the major marital assets:

### Shares of Stock

In a financial statement given to Hillcrest State Bank dated June 10, 1977, Edward represented that he owned marketable securities worth Thirty Thousand and No/100 Dollars ($30,000.00). In a financial statement given to First Bank of St. Paul dated March 21, 1978, Edward represented that he owned marketable securities worth Thirty-eight Thousand and No/100 Dollars ($38,000.00).

### Value of Insurance Agency

At a hearing before the referee on the motion to vacate the judgment, Mary's expert, Nicholas Romer, testified that, in 1979, the insurance agency was worth between Sixty Thousand and No/100 Dollars ($60,000.00) and Ninety Thousand and No/100 Dollars ($90,000.00). Mr. Romer testified that service businesses are typically valued at three times the net profit or at gross sales. Mr. Romer based his estimate of the insurance agency's 1979 value on the gross income figure of Sixty Thousand and No/100 Dollars ($60,000.00) taken from the court's finding in the 1979 judgment and decree.

At a hearing before the trial court, Professor Roger Palmer, Mary's second expert, testified that the 1979 value of the agency was between One Hundred Thousand and No/100 Dollars ($100,000.00) and One Hundred Fifty-one Thousand and No/100 Dollars ($151,000.00). Professor Palmer used three different methods to arrive at this range of values. In order to arrive at the $100,000 value, Professor Palmer used the sale price that Edward reported on his income tax return after he sold the agency to his brother in 1985. According to Edward's agreement with his brother, this amount was supposed to represent 50 percent of gross casualty insurance commissions over a 5-year period. The second method used by Professor Palmer was "a standard insurance industry valuation" of one and one-half times premium income. Using this method, Professor Palmer multiplied Ninety Thousand and No/100 Dollars ($90,000.00) by 1.5 to reach a value of One Hundred Thirty-five Thousand and No/100 Dollars ($135,000.00).

The third method used by Professor Palmer was arrived at by determining the present value, as of March 1978, of 50 percent of gross agency income over the 5 subsequent years using a 15 percent growth rate factor. Using this method, Professor Palmer concluded that the agency's value in March of 1978 was One Hundred Fifty-one Thousand, One Hundred and No/100 Dollars ($151,100.00). Under cross-examination, Edward admitted that, for the 5-year period between 1978 and 1983, gross commissions were approximately Two Hundred Twenty-one Thousand and No/100 Dollars ($221,000.00).

In her findings of fact dated February 10, 1988, the trial judge selected the One Hundred Thousand and No/100 Dollars ($100,000.00) figure as the 1979 value of the agency because it was "amply supported" by Edward's willingness to sell the agency at less than what he told banks it was worth and substantially less than the value determined according to the standard industry method of one and one-half times gross commissions.

### Partnership Interests

The judgment and decree listed a one-fourth interest in two partnerships valued at Thirty Thousand and No/100 Dollars ($30,000.00) as belonging to Edward. The partnerships are not specifically identified. In a financial statement provided to a bank dated September 4, 1980, Edward represented that his interest in two partnerships was worth Seventy-five Thousand and No/100 Dollars ($75,000.00). On his 1981 tax returns, Edward listed three partnership interests valued at approximately Seventy Thousand and No/100 Dollars ($70,000.00). Based in part on this information, Mr. Romer, Mary's expert witness in the hearings before the referee, testified that he believed the Thirty Thousand and No/100 Dollars ($30,000.00) value listed in the judgment and decree was understated.

## Unimproved land

The 1979 judgment and decree listed and awarded to Edward certain unimproved land in Pine, Carlton and Kanabec Counties valued at Four Thousand and No/100 Dollars ($4,000.00). In various financial statements dated both before and after the divorce, Edward consistently listed land located in these counties as having an estimated market value of Sixty-one Thousand and No/100 Dollars ($61,000.00) and One Hundred Twenty Thousand and No/100 Dollars ($120,000.00).

## Other Real Property

Counsel for Mary alleged that Mary became aware of her interest in two parcels of property as a result of being asked to execute quit claim deeds by the people who had purchased them from Edward. At the hearing before the referee, Mary testified that she learned that she and Edward had an interest in two parcels known as the Maryland Avenue and the Kent Avenue properties. With respect to the Maryland Avenue property, documents produced at the hearing before the referee indicated that this property was purchased by Edward and Mary in August of 1978 and sold by them on a contract for deed in December of 1978. With respect to the Kent Avenue property, Mary testified that she first learned of it when she was asked to sign a quit claim deed in 1984 with respect to her interest in it. Mary also testified that she never received any of the Four Thousand, Eight Hundred, Eighty-one and 27/100 Dollars ($4,881.27) allegedly paid to the Marandas on a contract for deed involving a sale of the Kent Avenue property.

## Misrepresentations in Edward's Interrogatories

In a hearing before the referee, Mary's original expert witness, Mr. Romer, testified that he compared Edward's income tax returns with Edward's answers to interrogatories served in connection with the motion to vacate the 1979 judgment and decree. Mr. Romer testified that Edward's 1985 tax return reported the sale of Two Hundred Fifty-eight Thousand and No/100 Dollars ($258,000.00) in stock, but that Edward's answers to interrogatories did not disclose this. Edward's 1985 tax return indicated that approximately One Hundred Seventy-eight Thousand and No/100 Dollars ($178,000.00) in shares of stock were acquired in 1980 or 1981. In December of 1985, Mary served a set of interrogatories on Edward in connection with a request for an increase in child support from the Two Hundred and No/100 Dollars ($200.00) per month awarded in the 1979 judgment and decree. Edward had to be ordered by the court to answer these interrogatories. When he finally did so in April of 1986, he alleged that he was living on Eight Hundred Twenty-two and 49/100 Dollars ($822.49) per month. In the same year, Edward told the Internal Revenue Service that he earned Fifty-one Thousand and No/100 Dollars ($51,000.00). In 1985 and 1986, at the same time he indicated that he was having difficulty paying Two Hundred and No/100 Dollars ($200.00) per month child support, Edward took several trips to Rio de Janeiro, several skiing trips to Colorado, and a trip to China.

## Irregularities in the Trial Court Proceedings

The lower court proceedings were plagued by a series of scheduling problems. There were more than 17 continuances granted for various reasons. After the court of appeals denied Edward's counsel's request for a writ ordering the trial court to grant an additional continuance, she appeared late for what turned out to be the final hearing. Edward's counsel informed the court that Edward had, against her advice, left the country on a previously planned trip and repeated her request for a continuance. When this request was denied, Edward's counsel refused to cross-examine Mary's expert even though she had heard his direct testimony and stated that she was prepared to cross-examine him. After Edward's counsel refused to participate further in the proceedings, the trial court stated that it would make its decision based on the evidence presented to that point.

By order dated February 10, 1988, the trial judge granted judgment in favor of Mary in the amount of Five Hundred Eighty-nine Thousand, Fifty-six and No/100 Dollars ($589,056.00) including attorney fees, costs, expert fees, and interest.

The issues presented in this case are as follows:

I. Did the trial court have jurisdiction?

II. Does the conduct of a party entering into a property settlement stipulation presented to the court as the basis for entry of a marriage dissolution judgment constitute "fraud on the court" where the party has excluded the spouse from access to financial information throughout the marriage and materially misrepresented the existence and value of substantial marital property prior to entering into the stipulation and presenting it to the court?

III. Is there sufficient evidence in the record to support the trial court's determination of the 1979 value of the marital estate?

IV. Did the trial court abuse its discretion by refusing to grant a continuance on February 8, 1988?

V. Was Mary Maranda entitled to attorney fees on appeal?

In his briefs to the court of appeals and to this court, Edward argues that the trial court lacked jurisdiction to vacate the 1979 judgment. This argument is without merit. Mary brought her motion to vacate the 1979 judgment in September of 1985 pursuant to Minn.R.Civ.P. 60.02(3), (6). In *Lindsey v. Lindsey*, 388 N.W.2d 713 (Minn.1986), this court considered a similar motion. In *Lindsey*, this court decided that, although the motion before it had been brought pursuant to Rule 60.02, it should be treated as a motion to exercise

the court's inherent power to modify a final divorce decree based on an allegation of fraud on the court. *Lindsey*, 388 N.W.2d at 716. The *Lindsey* court concluded, however, that the lower court's interpretation of an earlier case was incorrect and noted:

*In the future*, however, motions to modify divorce decrees brought under Rule 60.02 should not be entertained by the district courts. The district courts lack jurisdiction under Rule 60.02 to consider such motions. Only when facts are alleged that amount to fraud on the court as enunciated in *Bredemann* [*v. Bredemann*, 253 Minn. 21, 91 N.W.2d 84 (1958)] may a district court set aside a divorce decree.

*Lindsey*, 388 N.W.2d at 716 n. 1 (emphasis added). Accordingly, because Mary brought her Rule 60.02 motion before this court's prospective remarks in *Lindsey* concerning a district court's jurisdiction to consider such a motion, the trial court in the present case had jurisdiction to consider this matter. In the present case, as in *Lindsey*, this court will treat Mary's Rule 60.02 motion as a motion to exercise the court's inherent power to modify a final divorce decree based on an allegation of fraud on the court.[1]

A finding of fraud on the court and the administration of justice must be made under the peculiar facts of each case. *Lindsey v. Lindsey*, 388 N.W.2d 713, 716 (Minn.1986). Courts, however, favor stipulations, particularly in marriage dissolution cases, as a means of simplifying and expediting litigation. *Tomscak v. Tomscak*, 352 N.W.2d 464, 466 (Minn.App.1984) (citing *Anderson v. Anderson*, 303 Minn. 26, 225 N.W.2d 837 (1975)). On appeal, a trial court's determination whether or not to vacate a stipulation will not be disturbed in absence of an abuse of discretion. *Id.* Similarly, a trial court has broad discretion in evaluating and dividing property in a marriage dissolution and will not be overturned except for abuse of discretion. *Cas-*

---

1. In 1988, apparently in response to the *Lindsey* decision, the legislature amended Minn.Stat. § 518.145 (1988) in order to provide a mechanism for re-opening dissolution decrees by motion or independent action. *See* Act of April 26, 1988, ch. 668, § 11, 1988 Minn.Laws 1007, 1011. Minn.Stat. § 518.145, subd. 2 is virtually identical to Rule 60.02. Accordingly, post-*Lindsey* motions to vacate should be brought under Minn.Stat. § 518.145.

tonguay v. Castonguay, 306 N.W.2d 143, 146–47 (Minn.1981); Bogen v. Bogen, 261 N.W.2d 606, 609 (Minn.1977).

The significance of a finding of fraud on the court is that it eliminates the time restriction for bringing a motion to vacate a judgment. See Minn.R.Civ.P. 60.02. In order for the 1–year time limit for motions brought under Rule 60.02(3) to make any sense, however, there must be a difference between ordinary fraud and "fraud on the court." Beugen v. Beugen, 352 N.W.2d 821, 823 (Minn.App.1984). This court has not previously defined this difference. Other courts construing Rule 60.02 have sought to distinguish between circumstances constituting ordinary fraud and those constituting "fraud on the court" in order to determine which motions are subject to the 1–year limitations period. See e.g., Kupferman v. Consolidated Research & Mfg. Corp., 459 F.2d 1072, 1078 (2d Cir. 1972); Angier v. Angier, 415 N.W.2d 53, 56 (Minn.App.1987); see generally 2A Herr & Haydock, Minnesota Practice § 60.24 (1985). The United States Court of Appeals for the Eighth Circuit has characterized fraud on the court as "a scheme to interfere with the judicial machinery performing the task of impartial adjudication, as by preventing the opposing party from fairly presenting [their] case * * *." Pfizer, Inc. v. International Rectifier Corp., 538 F.2d 180, 195 (8th Cir.1976) (citing, inter alia, Kupferman v. Consolidated Research & Mfg. Corp., 459 F.2d 1072, 1078 (2d Cir.1972); England v. Doyle, 281 F.2d 304, 309 (9th Cir.1960)).

In England, the Ninth Circuit Court of Appeals stated that, "[i]n order to set aside a judgment or order because of fraud upon the court * * * it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision." England, 281 F.2d at 309 (citations omitted). The Pfizer court apparently narrowed this definition by stating: "A finding of fraud upon the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel * * *." Pfizer, 538 F.2d at 195.

It is the narrower Pfizer definition which is urged on this court by Edward's counsel. The court of appeals cited Kupferman v. Consolidated Research & Mfg. Corp., 459 F.2d 1072, 1078 (2d Cir.1972), as authority for the notion that fraud on the court only includes that species of fraud which defiles the court itself or is perpetrated by officers of the court. Maranda v. Maranda, 435 N.W.2d 621, 624 (Minn.App.1989). This court refuses to adopt such a narrow definition of fraud in marriage dissolution cases. While such a standard may be applicable to ordinary civil litigation, it has no place in family law. In dissolution cases, the court sits as a third party, representing all of the citizens of the State of Minnesota to see that a fair property distribution is made. Karon v. Karon, 435 N.W.2d 501, 503 (Minn.1989).

■ Because of the court's unique role in marriage dissolution cases, the narrow standard of fraud on the court articulated in Kupferman and Pfizer is inappropriate. In a stipulated marriage dissolution, if one party defrauds the other, he or she necessarily defrauds the court which sits as a third party to the stipulation. This is significantly different from stipulations involving ordinary commercial parties and a court that is not a party to the stipulation. While we decline to outline a precise definition of fraud on the court, we will focus on whether the offending party engaged in an unconscionable scheme or plan to influence the court improperly. Under this approach, the difference between fraud and fraud on the court is primarily a difference of degree rather than kind.

■ In Ronnkvist v. Ronnkvist, 331 N.W.2d 764, 765–66 (Minn.1983), this court stated that parties to a marital dissolution have a duty to make a full and accurate disclosure of all assets and liabilities to facilitate the trial court's property distribution. Thus, we hold that fraud on the court must be an intentional course of material misrepresentation or non-disclosure, having the result of misleading the court and opposing counsel and making the property settlement grossly unfair.

■ The record in this case supports a conclusion that the trial court did not abuse its discretion in vacating the 1979 judgment and decree. In particular, the following factors support the trial court's determination: (1) throughout the parties' marriage and the separation period, Mary was systematically excluded from access to information concerning the parties' finances; (2) Edward willfully misrepresented and failed to disclose the existence and value of marital property; (3) given the fact he knew that he was being paid by Edward, there is considerable doubt as to whether Mary's counsel exercised competent and independent judgment by failing to take any steps to determine the nature and value of the parties' property; (4) Edward's unmitigated contempt for the judicial process, including dissipating assets during the pendency of these proceedings and being less than candid in his answers to interrogatories, supports an inference that, even if Mary would have had the money to engage in discovery at the time of the stipulation, Edward would still have misrepresented the facts; (5) the fact that Edward induced Mary to accept the stipulation by promising to be fair for the sake of the children; and (6) the fact that Edward concealed hundreds of thousands of dollars such that, as in *Lindsey,* the stipulation here is grossly unfair, making it impossible for the original trial court to approve a fair settlement.

■ One of the most troubling aspects of this case is that there was a delay of over 6 years between the original judgment and decree and the motion to vacate. We fully understand the need for finality in dissolution decrees. We also understand that the passage of time dissipates the ability to reconstruct the value of the marital estate at the time of separation. In most cases, a year or two should suffice to discover the fraud. In cases brought an unreasonably long time after the original judgment, the doctrine of laches should be used to prevent abuse. While the 6–year delay in this case is an extreme example and probably reaches to the outer limits of reasonableness, the record is clear that Edward's conduct prevented Mary from having sufficient facts to bring the case earlier. Therefore, we decline to apply laches in this case.

■ The trial court's evaluation of a marital estate should be affirmed if it has an acceptable basis in fact even if this court might have taken a different approach. *Castonguay v. Castonguay,* 306 N.W.2d 143, 147 (Minn.1981). Mary's expert, Professor Palmer, testified at length regarding the representations contained in the financial statements Edward supplied to various banks and the information Edward provided to the IRS. The fact that Edward's tax return for 1979 was unavailable makes the expert's conclusions about the 1979 value of the marital estate somewhat conjectural. However, Edward had exclusive possession and control over this tax return so if the return were unavailable, he is partly responsible for Mary's inability to prove with certainty what the 1979 value of the estate was. Again, the trial court had the opportunity to observe the expert witness and assess his demeanor and credibility. The expert studied financial statements from 1977 and 1978 and then compared the representations therein with those provided in the financial statements given to banks in 1980, 1981, 1983, and 1985 as well as the tax returns for 1981, 1982, 1983, 1984 and 1985. The expert testified that, by comparing what Edward said the value of the estate was before the divorce and what he said it was after the divorce, it is possible to "interpolate" or fill in the gap as to the 1979 value.

The most speculative part of the trial court's determination is the One Hundred Eighty-one Thousand, One Hundred Fifty-nine and No/100 Dollars ($181,159.00) "accumulation" adjustment added to the court's basic determination that Mary's share of the estate is Three Hundred Eighty Thousand and No/100 Dollars ($380,000.00). The court concluded that the 1979 value of the estate was Five Hundred Seventy-nine Thousand and No/100 Dollars ($579,000.00). The Five Hundred Seventy-nine Thousand and No/100 Dollars ($579,-000.00) is the intermediate estimate of the 1979 value of the marital estate given by Mary's expert, Professor Palmer. In arriv-

ing at that figure, Professor Palmer took the sum of Four Hundred Sixty-four Thousand and No/100 Dollars ($464,000.00) from the September 1980 financial statement and added One Hundred Thousand and No/100 Dollars ($100,000.00) to account for the value of the insurance agency and Fifty-six Thousand and No/100 Dollars ($56,000.00) for the assets which had already been distributed to Mary. The total of Six Hundred Twenty Thousand and No/100 Dollars ($620,000.00) is Professor Palmer's best estimate of the value of Edward's estate as of September 7, 1980. This amount was then discounted at 6 percent to arrive at Five Hundred Seventy-nine Thousand and No/100 Dollars ($579,000.00) as the value of the marital estate as of August 1979.

Using the Five Hundred Seventy-nine Thousand and No/100 Dollars ($579,000.00) figure, the court concluded that Mary's proper share should have been Two Hundred Eighty-nine Thousand and No/100 Dollars ($289,000.00). The court then subtracted the Fifty-six Thousand and No/100 Dollars ($56,000.00) Mary actually received as a result of the 1979 judgment to arrive at a net figure of Two Hundred Thirty-three Thousand and No/100 Dollars ($233,000.00). The court compounded this amount at a rate of 6 percent per annum to reach a figure of Three Hundred Eighty Thousand and No/100 Dollars ($380,000.00). In selecting the 6 percent figure, the court used Mary's expert's calculation of the actual rate of growth of Edward's assets during the period from September 1979 to December 1987. However, because Edward admitted to selling some of his assets in order to maintain his lifestyle during this period, the expert concluded that this 6 percent accumulation rate was a lower rate of growth than that which would have occurred if Edward had not sold the assets. Professor Palmer testified that if Mary had invested these assets in investment grade bonds during this period, she would have been able to earn 12 percent per annum. As an alternative to the 12 percent rate, Professor Palmer calculated the value of the estate compounded at 6 percent, but with an additional adjustment to account for the value of the assets sold by Edward during this period. Instead of adopting the 12 percent rate of return, the court decided to adopt 6 percent and adjust it to account for the value of the assets that Edward sold during the relevant period.

We conclude, therefore, that the net amount decided by the trial court as Mary's additional share of the marital estate is not clearly erroneous and was a reasonable conclusion based on the evidence before the court with the exception as follows: Regarding the One Hundred Eighty-one Thousand, One Hundred Fifty-nine and No/100 Dollars ($181,159.00) accumulation adjustment added to the Three Hundred Eighty Thousand and No/100 Dollars ($380,000.00) basic share of the marital estate, due to Mary we find that this figure is too speculative, appears to be at least a partial duplication of the return and is not based on sufficient evidence to be sustained. We thus agree with the court of appeals that the One Hundred Eighty-one Thousand, One Hundred Fifty-nine and No/100 Dollars ($181,159.00) trial court award is clearly erroneous, and the trial court is reversed on that item. It is affirmed in granting Mary an additional award of Three Hundred Eighty Thousand and No/100 Dollars ($380,000.00) as part of the marital estate.

We also agree with the court of appeals that the trial court did not abuse its discretion in refusing to grant a continuance at the February 8, 1988 hearing. The record shows that the trial court was a model of restraint and patience in dealing with respondent and his counsel. The courts of this state are not a smorgasbord, available only at the time and place of litigants' choosing. The conduct of respondent throughout these proceedings cannot and will not be tolerated.

The final issue is the question of attorney fees. We reinstate the attorney fees and costs awarded by the trial court. In addition, we award petitioner Five Thousand and No/100 Dollars ($5,000.00) in additional attorney fees and costs and disbursements incurred in the appeals before the court of appeals and this court.

The case is remanded to the trial court for the purpose of amending the original decree of dissolution to award Mary an additional Three Hundred Eighty Thousand and No/100 Dollars ($380,000.00) plus attorney fees and costs in accordance with this opinion.

KELLEY, Justice.

I concur in the result only.