In re the Marriage of George Clifford
**SANBORN, III, Petitioner,
Appellant,**

**v.**

**Lynette Isis Dean SANBORN,
Respondent,**

**and**

**Lynette Isis Dean GUDRAIS, f/k/a
Lynette Isis Dean Sanborn,
Respondent,**

**v.**

**George Clifford SANBORN,
III, Appellant.**

**No. C5–92–2140.**

Court of Appeals of Minnesota.

July 20, 1993.

Review Denied Sept. 21, 1993.

**500**

Richard D. Goff, Goff, Kaplan & Wolf, P.A., St. Paul, for appellant.

Louis M. Reidenberg, Jeffrey R. Arrigoni, Reidenberg & Arrigoni, Minneapolis, for respondent.

Considered and decided by HUSPENI, P.J., and HARTEN and HOLTAN *, JJ.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

HUSPENI, Judge.

Appellant George Sanborn III challenges the trial court's vacation of the parties' dissolution decree. Respondent Lynette Isis Dean Gudrais moved the trial court to reopen the decree, claiming Sanborn had committed fraud on the court by failing to accurately disclose and by misrepresenting the value of the parties' assets. The trial court found Sanborn misrepresented the true value of his business, Sanborn Aviation, Inc., and his conduct amounted to fraud on the court. The trial court vacated the decree as to spousal maintenance, child support, and division of property. We affirm.

## FACTS

The parties were married in 1963 and had three children. In 1976, Sanborn started Sanborn Aviation, Inc. ("SAI") with three partners, Thomas, James, and John Kamp. SAI is in the business of storing, maintaining, repairing, and fueling planes at St. Paul Airport.

In September 1987, the parties separated. In December 1987, Sanborn met with Gudrais and showed her a proposed division of property that valued his 52.6% share of SAI stock at $324,140. He also provided Gudrais with a SAI balance sheet from September 30, 1987, that showed SAI had total assets of $466,336.71. Sanborn told her that he was being truthful concerning SAI's value.

During this time, beginning in July 1987, Sanborn was involved in extensive negotiations to sell SAI. On March 2, 1988, Sanborn signed a letter of intent to sell SAI to Metro Business Aviation Center ("MBAC"). MBAC planned to merge SAI and SAI's competitor into one entity and build a new facility. The letter of intent included a proposed payment schedule which amounted to about $2,000,000. Sanborn did not disclose this letter of intent to Gudrais or her attorney.

On March 14, 1988, Sanborn commenced dissolution proceedings. On the same day, the parties signed a stipulation that, among other things, awarded Gudrais custody of the children, reserved the issue of child support, waived either party's right to maintenance, and awarded Sanborn the ownership of all SAI stock. The stipulation did not indicate the value of SAI. Sanborn had not told Gudrais about his negotiations to sell SAI or the letter of intent.

In April 1988, Gudrais confronted Sanborn after hearing SAI was being sold for $2,000,000. Sanborn testified he told her at that time the idea of selling SAI for that price was "ridiculous." Sanborn testified he told her that SAI may be part of a "business deal" involving MBAC, but that nothing had been finalized. In either case, it is undisputed that Sanborn did not tell Gudrais about his negotiations to sell SAI.

The default dissolution hearing was originally scheduled for May 20, 1988. For a reason not explained in the record, the hearing was rescheduled to April 29, 1988; Gudrais was not notified of the scheduling change. On April 29, 1988, the parties' decree was entered incorporating the March 1988 stipulation.

On July 13, 1988, Sanborn sold SAI. The terms of the sale involved installment payments over a period of time amounting to about $2,100,000. In early July, after reading in the paper about SAI's sale, Gudrais moved for vacation of the decree on the ground that Sanborn had defrauded her by selling SAI for a price considerably higher than the value represented to her.

Before the hearing on Gudrais' July 1988 motion, Sanborn arranged a meeting with her. Sanborn subsequently testified that at the 1988 meeting he gave Gudrais all the documents relating to the sale, and then together they wrote a letter to their children explaining that the original stipulation was fair, that Gudrais would drop the vacation motion, and that she would not start any new actions against Sanborn. Gudrais, in contrast, testified Sanborn told her he needed to pay his partners $700,000 from SAI's sale proceeds and that if she successfully vacated the decree, she would not receive as much money. Gudrais did not pursue her July 1988 vacation motion after the meeting with Sanborn.

At their meeting, however, Sanborn neglected to tell Gudrais that a month earlier, on June 14, 1988, he had settled a lawsuit against his partners (the Kamp agreement), in which he received Thomas and James Kamp's SAI stock for $100 and an agreement to store and service their airplanes for ten years. The exact value of the agreement to service the Kamp's planes was contested at the hearing. The trial court ultimately found, based on Sanborn's 1989 deposition testimony and his June 1990 affidavit, that the value of Sanborn's service to the Kamps was about $10,000 yearly for ten years.

In May 1989, Gudrais learned from Thomas Kamp that neither he nor his brother had received $700,000 from Sanborn. In December 1989, Gudrais sued Sanborn, claiming he breached his fiduciary duty by misrepresenting the value of SAI. A month later, Gudrais moved for child support modification. The trial court consolidated the breach of fiduciary duty claim with the modification proceedings in June 1990.

In April 1992, Gudrais moved for vacation of the decree as to marital property division because of fraud on the court, see Minn.Stat. § 518.145, subd. 2 (1990), or for an order granting relief as requested in Gudrais' January 1988 motion for reasonable child support. Following a hearing, the trial court found Sanborn made material nondisclosures to Gudrais and engaged in an intentional course of material misrepresentation or nondisclosure, resulting in misleading the court and making the property settlement unfair. The trial court vacated the decree as to child support, spousal maintenance, and property division. This appeal followed.

Gudrais filed a notice of review, raising issues relative to valuation, calculation of the property award, Sanborn's obligations to the Kamps, and child support. In her brief, Gudrais states that the notice of review was

only filed in the event that [this court] interprets the Trial Court's preliminary findings that were utilized to determine the property division was grossly unfair is [sic] the Court's binding decision on what modifications should be facilitated relative to the property division in favor of [Ms. Gudrais].

## ISSUES

1. Did the trial court err by concluding Sanborn committed fraud upon the court?

2. Was Gudrais' motion to vacate the decree barred by laches?

3. Is Gudrais entitled to attorney fees on appeal?

## ANALYSIS

On appeal, a trial court's decision to vacate a decree involving property division, child support, and spousal maintenance because of fraud on the court will not be disturbed absent an abuse of discretion. *See Maranda v. Maranda*, 449 N.W.2d 158, 164 (Minn.1989) (trial court has discretion to vacate a stipulation for fraud on the court). A trial court's findings concerning allegations of fraud on the court must be upheld unless clearly erroneous. *Mahoney v. Mahoney*, 474 N.W.2d 232, 234 (Minn.App.1991), *pet. for rev. denied* (Minn. Nov. 13, 1991).

## I.

Generally, a dissolution decree is final when entered, subject to the right of appeal. Minn.Stat. § 518.145, subd. 1 (1990). A court may, however, set aside a dissolution decree for fraud upon the court. Minn.Stat. § 518.145, subd. 2 (1990). "A finding of fraud on the court and the administration of justice must be made under the peculiar facts of each case." *Maranda*, 449 N.W.2d at 164 (citing *Lindsey v. Lindsey*, 388 N.W.2d 713, 716 (Minn.1986)).

The Supreme Court set out the "peculiar facts" in *Maranda* as follows:

Sometime before the stipulation was executed in July 1979, Mary contacted an attorney to represent her in the dissolution proceeding. Mary paid the attorney

Three Hundred and No/100 Dollars ($300.00) and Edward paid him Seven Hundred Fifty and No/100 Dollars ($750.00), the remainder of the fee for handling the dissolution. Mary's attorney received all his information regarding the value of the marital estate from Edward. With respect to the financial information provided to Mary's attorney, Edward told Mary that, because the couple's children were involved, he would be fair in dividing up the marital property. Mary had no money for pretrial discovery beyond the initial Three Hundred and No/100 Dollars ($300.00) she gave to her attorney.

Mary maintains that her attorney did not obtain an appraisal of the homestead or the Maranda insurance agency, copies of recent tax records, banking or stock brokerage records, real property records, or a verified statement from Edward as to the nature and value of marital property. After drafting the stipulation, her attorney spent approximately 15 minutes discussing it with Mary.

*Id.* at 160.

In *Maranda*, the supreme court distinguished between the narrow definition of fraud on the court as used in civil litigation and its broader definition in dissolution cases. *Id.* at 165. The supreme court rejected the notion that fraud on the court "only includes that species of fraud which defiles the court itself or is perpetrated by officers of the court." *Id.* Instead, the *Maranda* court stated that in dissolution cases, where the court sits as a third party to ensure a fair property distribution is made, a broader standard of fraud is proper. *Id.*

In a stipulated marriage dissolution, if one party defrauds the other, he or she necessarily defrauds the court. * * * While we decline to outline a precise definition of fraud on the court, we will focus on whether the offending party engaged in an unconscionable scheme or plan to influence the court improperly. * * * [P]arties to a marital dissolution have a duty to make a full and accurate disclosure of all assets and liabilities to

facilitate the trial court's property distribution.

*Id.* (citation omitted).

The facts of *Maranda* and those of this case are similar. Like the wife in *Maranda*, Gudrais received all of her information about Sanborn's business assets from Sanborn. Further, throughout the parties' marriage and separation, Gudrais relied upon Sanborn to make the parties' financial decisions. Moreover, like the wife's attorney in *Maranda*, Gudrais' attorney conducted very little discovery into Sanborn's assets.

■ Fraud on the court in the marriage dissolution context has three general components: (1) an intentional course of material misrepresentation or nondisclosure; (2) having the result of misleading the court and opposing counsel; and (3) making the property settlement unfair. *Id.* We conclude the trial court acted within its discretion by vacating the 1988 decree on the basis of fraud on the court.

First, the trial court did not err by finding Sanborn engaged in an intentional course of material misrepresentation and nondisclosure. During the parties' discussions leading up to the March 1988 stipulation, the only information Gudrais reviewed concerning SAI's value was provided by Sanborn. During this time, Gudrais testified she still loved her husband, trusted him, and was not involved in SAI business affairs. In January 1988, Sanborn represented to Gudrais that his 52.6% interest in SAI was valued at $324,140 and SAI's total assets were $466,336.71. Sanborn, however, intentionally failed to disclose to Gudrais his extensive negotiations to sell SAI between the summer of 1987 and April 1988. Then in April 1988, when Gudrais confronted him about the rumored sale of SAI, Sanborn told her the whole idea was "ridiculous," even though one month earlier he had signed a letter of intent which provided for SAI's sale for about $2,000,000. Gudrais testified she signed the stipulation in March 1988 without knowledge of the letter of intent and the proposed sale. Under these facts, the trial court did not err by finding Sanborn misrepresented the value of SAI and failed to disclose the negotiations for SAI's sale.

■ Second, the evidence supports the finding that Sanborn's misrepresentation and nondisclosures misled the trial court and opposing counsel. We emphasize that in the context of marriage dissolutions, the trial court sits as a third party representing all Minnesota citizens to ensure a fair property distribution is made. *Id.* Equally important, in a stipulated marriage dissolution, when one party defrauds the other party, it is tantamount to defrauding the court. *Id.* Accordingly, Sanborn's misrepresentations about SAI's value and his failure to disclose the letter of intent to either Gudrais or her attorney misled the trial court and thwarted its effort to make a fair property settlement.

■ Sanborn's main contention is that his representations did not mislead Gudrais' trial court attorney and therefore fraud on the court was not shown. We disagree and conclude that the factual similarities between this case and *Maranda* would not support the determination of fraud upon trial counsel declared in *Maranda* and yet compel a determination that fraud upon counsel was not sustainable here. Parties to a marital dissolution proceeding have a duty to make a full and accurate disclosure of all assets and liabilities to facilitate the trial court's property distribution. *Ronnkvist v. Ronnkvist,* 331 N.W.2d 764, 765–66 (Minn.1983); *see also Maranda,* 449 N.W.2d at 165. In this case, it is evident that Sanborn breached this duty by failing to disclose to Gudrais the actual value of SAI, his negotiations to sell SAI, and the March letter of intent. Sanborn continued to mislead Gudrais and her attorney after entry of the decree when in July 1988 Sanborn erroneously told Gudrais he had to pay $700,000 to his partners for purchase of their shares of SAI.

It is true, as Sanborn argues, that Gudrais' trial attorney advanced only minimal discovery, did not have an appraisal of SAI done, and did not take Sanborn's deposition. Had more thorough discovery been done, Sanborn's argument implies, the ne-

gotiations to sell SAI would have been revealed. This position, however, severely erodes the premise underlying the policy favoring dissolutions by stipulation. If all information exchanged by parties about their assets must be scrutinized through discovery, then a marital termination agreement will neither expedite nor simplify litigation in dissolution cases. *See Tomscak v. Tomscak*, 352 N.W.2d 464, 466 (Minn.App.1984) (courts favor stipulations as a means of expediting dissolution litigation). Moreover, given that Sanborn failed to inform either Gudrais or her attorney of the March letter of intent, that he failed to tell Gudrais or her attorney about SAI's sale, and that he distorted the financial impact of the Kamp agreement on him, we cannot speculate whether the actual circumstances surrounding the negotiations to sell SAI would have been revealed through discovery.

Third, Sanborn argues the trial court's finding that his nondisclosures made the property settlement "grossly unfair" is clearly erroneous. We disagree. The trial court findings reveal a huge disparity in the value of property awarded to each party, a disparity arising primarily from the misrepresented value of SAI. Accordingly, the trial court did not err by finding the original property settlement grossly unfair. *See Maranda*, 449 N.W.2d at 166 (fact that husband concealed hundreds of thousands of dollars made it impossible for trial court to approve a fair settlement).

## II.

▪ Sanborn's argument that Gudrais' motion to vacate is barred by laches is unpersuasive. The record shows Sanborn never raised the issue before the trial court. Issues not raised before the trial court will not be addressed on review. *Schumacher v. Ihrke*, 469 N.W.2d 329, 335 (Minn.App.1991). Even assuming the issue was properly raised, under the doctrine of unclean hands, Sanborn is precluded from employing the equitable doctrine of laches. Gudrais' delay in challenging the 1988 decree was in large part due to Sanborn's intentional course of continued misrepresentation and nondisclosure. Under these facts, laches is inapplicable. *See Maranda*, 449 N.W.2d at 166 (laches not applied when husband's conduct prevented wife from having sufficient facts to bring the case for six years).

We need not address the issues raised by respondent in her notice of review, because we conclude that the trial court did not finally resolve these issues in its order vacating certain provisions of the decree. The trial court retains its discretion to address these issues in the subsequent proceedings to be held in this case.

Respondent's request for an award of attorney fees on appeal is granted and will be addressed by separate order.

## DECISION

The trial court's order to vacate the decree as to property division, child support, and spousal maintenance is affirmed.

**Affirmed.**